STATE OF NORTH CAROLINA v. WARREN ROBERT GREGORY

No. 232A93

(Filed 28 July 1995)

## 1. Criminal Law § 78 (NCI4th)— pretrial publicity—denial of change of venue

The trial court did not err in the denial of defendant's motion for change of venue of his murder, kidnapping and rape trial based on pretrial publicity because defendant failed to meet his burden of showing that pretrial publicity precluded him from receiving a fair and impartial trial in the county where newspaper articles submitted in support of the motion related to the facts of the crimes, defendant's arrest, his subsequent escape attempt, and a petition circulated by one victim's family seeking a speedy disposition of defendant's trial; none of these articles was shown to be inflammatory or biased against defendant; the testimony of two attorneys and a private investigator indicated only that the trial had received media and word-of-mouth publicity in the county but failed to establish that this publicity was inflammatory or prejudicial against defendant; and each juror and alternate juror on defendant's jury unequivocally answered in the affirmative when asked if he or she could put aside any previous opinions about this case and decide the case solely upon the evidence presented at trial.

**Am Jur 2d, Criminal Law § 378.**

**Pretrial publicity in criminal case as ground for change of venue. 33 ALR3d 17.**

**Pretrial publicity in criminal case as affecting defendant's right to fair trial—federal cases. 10 L. Ed. 2d 1243.**

## 2. Jury § 203 (NCI4th)— pretrial publicity—denial of challenge for cause

A defendant on trial for murder, kidnapping and rape was not prejudiced by the trial court's denial of his challenge for cause of a prospective juror based on pretrial publicity where the juror was exposed only to general pretrial publicity about the case and was unfamiliar with any details other than the location of the victims' bodies when they were discovered; and although the juror expressed some initial concern with the difficulty of setting aside pretrial information, he established that he could do so when he

informed defense counsel that he could be fair to defendant even if it was difficult and informed the trial court that he could and would set aside any previous opinions he may have had about defendant's case.

**Am Jur 2d, Jury § 294.**

**Religious belief, affiliation, or prejudice of prospective juror as proper subject of inquiry or ground for challenge on voir dire. 95 ALR3d 172.**

3. **Evidence and Witnesses § 1695 (NCI4th)— photographs of victims' decomposed and mutilated bodies—denial of pretrial motion to exclude**

The trial court did not abuse its discretion in the denial of defendant's pretrial motion to exclude two photographs of the bodies of two murder and rape victims depicting enlarged wounds caused by decomposition and small animals where the photographs were in black and white and showed the condition and location of the victims' bodies at the time they were found; the photographs illustrated the testimony of the forensic pathologist who conducted the autopsies about the injuries inflicted on the victims, including testimony that it was impossible to determine from the autopsy whether the victims had been strangled or sexually assaulted due to decomposition of the bodies; and there was no evidence that the photographs were used excessively and solely to inflame the passions and prejudices of the jury against defendant.

**Am Jur 2d, Evidence §§ 960-974.**

**Admissibility of photograph of corpse in prosecution for homicide or civil action for causing death. 73 ALR2d 769.**

4. **Jury § 92 (NCI4th)— capital case—jury voir dire not unduly restricted**

The trial court did not unduly restrict defendant's voir dire of potential jurors in a capital case where the trial court allowed inquiry into views that would render a juror unable to be fair to defendant, to consider the evidence, and to follow the law, inquiry into the exposure of prospective jurors to pretrial publicity and the effect such publicity would have on their ability to give defendant a fair trial, and inquiry as to whether a juror would

automatically vote to impose the death penalty regardless of the facts and circumstances of defendant's case; these questions were sufficient to reveal any bias that a prospective juror might have and to ensure defendant a fair and impartial jury and a nonarbitrary, individualized sentencing proceeding; and the majority of defendant's questions to which objections were sustained were irrelevant, improper in form, attempts to stake out jurors, questions to which the answer was admitted in response to other questions, or questions that contained an incomplete statement of the law.

**Am Jur 2d, Jury §§ 205-207.**

**5. Jury § 215 (NCI4th)— capital case—jury selection—death penalty views—denial of defendant's challenges for cause**

The trial court did not err in the denial of defendant's challenge for cause of three prospective jurors in a capital trial on the ground that they expressed a predisposition to vote for the death penalty in this case where one of the jurors was initially confused by defendant's questioning about the death penalty, but upon further questioning by the court, clearly stated that he would not automatically vote to impose the death penalty but would listen to the evidence and follow the law by weighing any aggravating circumstances against any mitigating circumstances; the second juror initially stated that if a person was proven guilty of the crime, he should suffer the full extent of the law, which he understood to be the death penalty, but after the sentencing procedure was explained to him, this juror stated that he would not automatically vote for the death penalty but would weigh the aggravating circumstances against the mitigating circumstances to determine if another penalty was appropriate in this case; and although the third juror had informed the court on the first day of jury selection that he had already formed an opinion as to what sentence defendant should receive, after the capital sentencing procedure was explained to him, he clearly stated that he would be able to set aside his former opinion as to the appropriate sentence and base his decision solely on the evidence presented at trial and in accordance with the law as given to him by the trial court.

**Am Jur 2d, Jury § 279.**

**Comment Note.—Beliefs regarding capital punishment as disqualifying juror in capital cases—post-*Witherspoon* cases. 39 ALR3d 550.**

**6. Jury § 215 (NCI4th)— capital case—jury selection—death penalty views—initial denial of defendant's challenges for cause—subsequent dismissal of jurors—absence of prejudice**

Defendant was not prejudiced by the trial court's denial of defendant's challenges for cause of two prospective jurors on the ground that they were predisposed to vote for the death penalty where both jurors were thereafter excused from the jury for cause by the trial court.

**Am Jur 2d, Jury § 279.**

**Comment Note.—Beliefs regarding capital punishment as disqualifying juror in capital cases—post-*Witherspoon* cases. 39 ALR3d 550.**

**7. Jury § 226 (NCI4th)— capital case—jury selection—death penalty views—excusal for cause without rehabilitation**

The trial court did not abuse its discretion in excusing three prospective jurors for cause based on their death penalty views or in denying defendant's request to rehabilitate each of them where each juror's responses to the prosecutor's questions revealed that the juror had personal and religious beliefs against the death penalty and would be unable to recommend a sentence of death regardless of the facts and circumstances of the case, and defendant made no showing that additional questioning would have resulted in different answers.

**Am Jur 2d, Jury § 279.**

**Comment Note.—Beliefs regarding capital punishment as disqualifying juror in capital cases—post-*Witherspoon* cases. 39 ALR3d 550.**

**8. Jury § 258 (NCI4th)— capital case—peremptory challenges of blacks—insufficient showing of purposeful discrimination**

Defendant failed to make a prima facie showing of purposeful discrimination by the prosecutor's peremptory challenges of five black prospective jurors in this capital trial where the victims are white women and defendant is a black male; defendant's jury consisted of nine white jurors and three black jurors; twelve of the sixty-one potential jurors were black; the prosecutor exercised a total of ten peremptory challenges, five against whites and

five against blacks; the State's primary witness against defendant was a black male; nothing in the prosecutor's questions or his statements in the exercise of his peremptory challenges revealed any discriminatory motive; the prosecutor did not ask any questions of a racial nature; there was no discernable difference in the prosecutor's method of questioning any black prospective jurors from the method of questioning the rest of the jury venire; and facts revealed during jury selection established the following nondiscriminatory reasons for the challenges: one juror informed the court that she realized the seriousness of the case and did not want to sit on the jury unless she had no other choice; the second juror did not drive, had to be brought to the courthouse by the Sheriff's Department each day, and informed the court that she felt hassled by members of the Sheriff's Department because some of them were giving her a difficult time about driving her to court each day; the third juror informed the court that he would have to drop out of college for the current quarter if he sat on the jury because he would miss several tests and registration for other classes; the fourth juror's son had felony charges currently pending against him in the same county; and a charge of carrying a concealed weapon against the fifth juror had been dismissed by one of the prosecutors in defendant's case.

**Am Jur 2d, Jury § 244.**

**Proof as to exclusion of or discrimination against eligible class or race in respect to jury in criminal case. 1 ALR2d 1291.**

**Use of peremptory challenge to exclude from jury persons belonging to a class or race. 79 ALR3d 14.**

**Supreme Court's views as to use of peremptory challenges to exclude from jury persons belonging to same race as criminal defendant. 90 L. Ed. 2d 1078.**

9. **Evidence and Witnesses § 2468 (NCI4th)— codefendant's plea agreement—testimony against defendant—no violation of public policy or due process**

A plea agreement between the State and a codefendant did not violate public policy or defendant's due process rights because the codefendant agreed to testify truthfully in defendant's trial in accordance with the codefendant's earlier statements to the police. It is clear from the context of the plea agreement

that it was conditioned only on the codefendant's truthful testimony at defendant's trial and did not unconstitutionally bind the codefendant to testify consistent with his earlier statements even if they were not truthful. N.C.G.S. § 15A-1054.

**Am Jur 2d, Criminal Law §§ 221, 222.**

**Enforceability of agreement by law enforcement officials not to prosecute if accused would help in criminal investigation or would become witness against others. 32 ALR4th 990.**

**10. Evidence and Witnesses §§ 1113, 1229 (NCI4th)— fantasy statements to another inmate—admission of party opponent**

A "fantasy statement" made by defendant to another inmate while he was in Central Prison awaiting trial which detailed defendant's participation in the shooting of the male victim and the kidnapping, rape and murder of each of the two female victims was admissible as an admission of a party opponent. N.C.G.S. § 8C-1, Rule 801(d)(A). Defendant's statement to the inmate clearly implicated defendant in the crimes charged, and his attempt to couch this confession in terms of make believe and fantasy does not render his inculpatory statement inadmissible hearsay. Furthermore, the statement was relevant under N.C.G.S. § 8C-1, Rule 401.

**Am Jur 2d, Evidence §§ 760-764.**

**Admissibility, in criminal prosecution, of evidence obtained by electronic surveillance of prisoner. 57 ALR3d 172.**

**11. Criminal Law § 390 (NCI4th)— capital sentencing—court's question to witness—expression of opinion on credibility—error cured by instructions—mistrial properly denied**

The trial judge improperly expressed an opinion on the credibility of defendant's only expert witness in violation of N.C.G.S. § 15A-1222 when he asked the witness, "Are you telling the truth now or were you telling the truth then?" However, any possible prejudice to defendant was cured when (1) the judge subsequently instructed the jury that he had no opinion about the witness's truthfulness or veracity and his question should not be interpreted as indicating any such opinion; (2) the court again

instructed during the final charge that the jurors were the sole judges of the credibility of each witness and must decide for themselves whether to believe or disbelieve the testimony of any witness; and (3) further questioning of the witness by the prosecutor resolved any confusion from the apparently inconsistent statements made by the witness. Since any possible prejudice to defendant from the trial judge's question was cured, the trial court did not abuse its discretion by denying defendant's motion for a mistrial based on this question.

**Am Jur 2d, Trial §§ 299-301.**

**Prejudicial effect of trial judge's remarks, during civil jury trial, disparaging the litigants, the witnesses, or the subject matter of the litigation. 83 ALR2d 1128.**

12. **Evidence and Witnesses § 2916 (NCI4th)— expert witness—inconsistency of statements by defendant and codefendant—cross-examination relevant for impeachment**

Where defendant's expert witness (a psychiatrist) testified in a capital sentencing proceeding that in performing a psychiatric evaluation, "you rely on as many records as you can get," and further testified that he reviewed statements made by the codefendants and by defendant when conducting his evaluation of defendant but that he did not rely on them as a basis for his opinion concerning defendant's mental condition, evidence elicited by the prosecutor on cross-examination of the witness about his reasons for reviewing these statements but not using them as a basis for his opinion testimony, including evidence that he knew the codefendants' statements contained versions of the events on the night of the murders different from defendant's statements, was relevant under Rule 611(b) to impeach the witness's expert testimony. N.C.G.S. § 8C-1, Rule 611(b).

**Am Jur 2d, Witnesses § 965.**

**Necessity and admissibility of expert testimony as to credibility of witness. 20 ALR3d 684.**

13. **Criminal Law § 1338 (NCI4th)— first-degree murders— aggravating circumstance—purpose of avoiding arrest— sufficiency of evidence**

The evidence was sufficient to support the trial court's submission of the aggravating circumstance that two murders were

committed for the purpose of avoiding or preventing a lawful arrest where a codefendant testified that shortly after defendant choked and snapped the neck of one victim until she was dead, defendant told a codefendant that he killed her "so we never have to go to prison," and there was evidence that after the other victim screamed, defendant told the second codefendant to "take care of business" and instructed him to use a shotgun instead of a pistol "because if you use the pistol you are going to have to shoot her three or four times." N.C.G.S. § 15A-2000(e)(4).

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was committed to avoid arrest or prosecution, to effect escape from custody, to hinder ·governmental function or enforcement of law, and the like—post-*Gregg* cases. 64 ALR4th 755.**

14. **Criminal Law § 1340 (NCI4th)— first-degree murders— aggravating circumstances—commission during rapes and kidnappings**

The trial court did not err by submitting the aggravating circumstances that each murder was committed while defendant was engaged in the commission of a rape, and also while he was engaged in the commission of a kidnapping, although defendant was convicted of two counts of rape and two counts of kidnapping, where defendant was convicted on two counts of first-degree murder upon both the theory of premeditation and deliberation and the theory of felony murder. When a defendant is convicted under both theories and both are supported by the evidence, submission of the underlying felony as an aggravating circumstance is proper. N.C.G.S. § 15A-2000(e)(5).

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Sufficiency of evidence, for death penalty purposes, to establish statutory aggravating circumstance that murder was committed in course of committing, attempting, or fleeing from other offense, and the like—post-*Gregg* cases. 67 ALR4th 887.**

**15. Criminal Law § 1343 (NCI4th)— first-degree murder— especially heinous, atrocious, or cruel aggravating circumstance—constitutional instruction**

The trial court's pattern jury instruction on the especially heinous, atrocious, or cruel aggravating circumstance provided constitutionally sufficient guidelines to the jury where it included the phrases "pitiless crime which was unnecessarily torturous to the victim" and "the level of brutality exceeds that normally present in first-degree murder."

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was heinous, cruel, depraved, or the like—post-*Gregg* cases. 63 ALR4th 478.**

**16. Criminal Law § 1347 (NCI4th)— first-degree murder— course of conduct aggravating circumstance—sufficiency of evidence**

The evidence was sufficient to support the trial court's submission of the "course of conduct" aggravating circumstance in a capital sentencing proceeding where it showed that defendant kidnapped the two murder victims from the side of the road and then raped and murdered them, and that defendant shot and seriously wounded a male companion of the murder victims shortly before he kidnapped the victims. N.C.G.S. § 15A-2000(e)(11).

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Sufficiency of evidence, for death penalty purposes, to establish statutory aggravating circumstance that murder was committed in course of committing, attempting, or fleeing from other offense, and the like—post-*Gregg* cases. 67 ALR4th 887.**

**17. Criminal Law § 1363 (NCI4th)— capital sentencing proceeding—codefendant's lesser sentence under plea bargain—inappropriate mitigating circumstance**

The trial court in a capital sentencing proceeding did not err by refusing to submit as a mitigating circumstance for each of two first-degree murders that a codefendant would not receive the death penalty for his participation in these crimes pursuant to a plea bargain with the State because (1) the fact a codefendant

received a lesser sentence under a plea agreement is irrelevant and inappropriate for the jury's consideration as a mitigating circumstance, and (2) evidence of the codefendant's plea bargain was before the jurors, who were free to deem it to have mitigating value and consider it under the catchall mitigating circumstance set forth in N.C.G.S. § 15A-2000(f)(9).

**Am Jur 2d, Criminal Law § 599.**

18. **Criminal Law § 680 (NCI4th)— capital case—mitigating circumstances—peremptory instructions—inadequate request**

The trial court did not err by denying defendant's request to give peremptory instructions on twenty-three mitigating circumstances where defendant conceded that he was not entitled to peremptory instructions on four of his proposed nonstatutory mitigating circumstances because they were not supported by uncontroverted evidence; evidence supporting five other proposed nonstatutory mitigating circumstances was also controverted; defendant did not specify for the trial court which nonstatutory mitigating circumstances were supported by uncontroverted evidence; and the trial court was not required to sift through all the evidence and determine which of defendant's proposed mitigating circumstances entitled him to a peremptory instruction. Further, defendant's request for peremptory instructions was inadequate because defendant did not clearly specify that he was seeking a different instruction for statutory and nonstatutory mitigating circumstances and did not propose a different peremptory instruction for the nonstatutory mitigating circumstances.

**Am Jur 2d, Criminal Law § 599.**

19. **Criminal Law § 1325 (NCI4th)— capital sentencing— mitigating circumstances—use of may in instructions— constitutionality**

The trial court's use of the word "may" in the instructions for the consideration of mitigating evidence in Issue Three and Issue Four in a capital sentencing proceeding did not unconstitutionally make the consideration of mitigating evidence discretionary with the jury during sentencing and did not allow jurors who found mitigating circumstances to exist in Issue Two to disregard them at Issues Three and Four.

Am Jur 2d, Trial §§ 840, 841.

## 20. Criminal Law § 1325 (NCI4th)— capital sentencing— instructions—consideration of mitigating circumstances

The trial court's capital sentencing instructions were not improper because they failed to require each juror to consider every mitigating circumstance found by at least one juror.

Am Jur 2d, Trial §§ 840, 841.

## 21. Criminal Law § 1325 (NCI4th)— capital sentencing— instructions—nonstatutory mitigating circumstances— finding of mitigating value

Defendant's constitutional rights were not violated by the pattern jury instructions in a capital sentencing proceeding which allowed jurors to determine in Issue Two whether a nonstatutory mitigating circumstance had mitigating value.

Am Jur 2d, Trial §§ 840, 841.

## 22. Criminal Law § 1362 (NCI4th)— capital sentencing—age as mitigating circumstance—sufficiency of instruction

The trial court's instruction to the jury in a capital sentencing proceeding that "[t]he mitigating effect of the age of the defendant is for you to determine from all the facts and circumstances which you find from the evidence" did not limit the consideration of the age of defendant as a mitigating circumstance solely to chronological age but allowed the jurors to consider all the facts and circumstances related to age that they found from the evidence, and the court did not err by failing to instruct that the age of defendant as a mitigating circumstance is not limited to his chronological age but includes other factors such as his mental and emotional development, his judgment and maturity, and his prior experiences.

Am Jur 2d, Criminal Law §§ 598, 599.

## 23. Constitutional Law § 371 (NCI4th); Criminal Law § 1298 (NCI4th)— first-degree murders—codefendant's plea bargain—defendant's death sentences not arbitrary

Sentences of death imposed upon defendant for two first-degree murders were not arbitrary and capricious because the State permitted a codefendant to plead guilty to noncapital offenses for his participation in these crimes in return for his truthful testimony against defendant and another codefendant

since disparity in sentences imposed upon codefendants does not result in cruel and unusual punishment and is not unconstitutional; the details of the plea bargain between the codefendant and the State were before the jury, and the codefendant was cross-examined about the sentence he would receive for testifying against defendant; and the jury was free to consider this evidence under the catchall mitigating circumstance in N.C.G.S. § 15A-2000(f)(9).

**Am Jur 2d, Criminal Law §§ 625-628.**

**Supreme Court's views on constitutionality of death penalty and procedures under which it is imposed or carried out. 90 L. Ed. 2d 1001.**

**24. Criminal Law § 468 (NCI4th)— capital sentencing—prosecutor's jury argument—urging appreciation of circumstances of crime—no impropriety**

The prosecutor's jury argument in a capital sentencing proceeding did not ask the jurors to put themselves in the place of the victims but urged the jury to appreciate the circumstances of the crimes. Therefore, the argument was not improper and the trial court did not err by failing to intervene *ex mero motu* to prevent it.

**Am Jur 2d, Trial §§ 664-667.**

**25. Criminal Law § 447 (NCI4th)— capital sentencing—closing argument—victim impact statements**

The prosecutor's use of victim impact statements during his closing argument in a capital sentencing proceeding did not render defendant's trial fundamentally unfair where the statements were made as a part of the prosecutor's argument that the deaths of the victims represented a unique loss to their families; his argument stressed that the victims were dead and that defendant was the person responsible for their deaths; and his argument about the location and condition of the victims' bodies was based on facts properly presented at trial.

**Am Jur 2d, Trial §§ 664-667.**

**26. Criminal Law § 452 (NCI4th)— capital sentencing—closing argument—comments on nonstatutory mitigating circumstance**

The prosecutor was properly characterizing and contesting the weight and validity of a nonstatutory mitigating circumstance

when he argued to the jury in a capital sentencing proceeding that the purpose of submitting the nonstatutory mitigating circumstance that defendant was convicted by the testimony of an accomplice was designed to influence the jury to question at sentencing whether it rightly found him guilty at the guilt-innocence phase of the trial and that he did not know how this was a mitigating circumstance since defendant had already been found guilty beyond a reasonable doubt.

**Am Jur 2d, Trial §§ 572, 841.**

**27. Criminal Law § 452 (NCI4th)— capital sentencing—closing argument—defendant's religion—comment on nonstatutory mitigating circumstance**

The prosecutor was merely characterizing and contesting the weight of defendant's proffered nonstatutory mitigating circumstance that he had served his country in time of war when the prosecutor mentioned that defendant served his country despite the conflict with his religious beliefs and argued that defendant's belief was not "thou shalt not kill" but was "thou shalt not kill Moslems, that is, kill anybody else but not Moslems," and the trial court did not err by failing to intervene *ex mero motu* to prevent this argument.

**Am Jur 2d, Trial §§ 658, 841.**

**28. Criminal Law § 436 (NCI4th)— capital sentencing—jury argument—defendant's lack of remorse and bad character**

The prosecutor's references to defendant's lack of remorse and bad character in his closing argument in a capital sentencing proceeding were not improper.

**Am Jur 2d, Trial § 566.**

**29. Criminal Law § 1373 (NCI4th)— death penalty for two murders—not disproportionate**

Sentences of death imposed upon defendant for two first-degree murders were not disproportionate to the penalty imposed in similar cases considering both the crime and the defendant where defendant was convicted on the theories of premeditation and deliberation and felony murder; defendant was also convicted of one count of assault with a deadly weapon with intent to kill inflicting serious injury, two counts of first-degree kidnapping, and two counts of first-degree rape; the jury found

each of the five submitted aggravating circumstances, including the especially heinous, atrocious, or cruel and course of conduct aggravating circumstances; the victims heard defendant shoot their male companion and were forced to ride in the car with defendant and the two codefendants; the victims were raped repeatedly before being killed; defendant attempted to strangle one victim, and when she later regained consciousness, he strangled her again until he successfully killed her; defendant also attempted to strangle the second victim, but she also regained consciousness, and defendant directed a codefendant to shoot her with a shotgun; the murders were thus marked by brutality and callousness; and the victims experienced extreme psychological and physical torture.

**Am Jur 2d, Criminal Law § 628.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from two judgments imposing sentences of death entered by Grant, J., at the 13 April 1993 Criminal Session of Superior Court, Pitt County, upon a jury verdict of guilty of two counts of first-degree murder. Defendant's motion to bypass the Court of Appeals as to additional judgments imposed for two counts of first-degree kidnapping, two counts of first-degree rape, and one count of assault with a deadly weapon with intent to kill inflicting serious injury was granted on 8 July 1994. Heard in the Supreme Court 14 March 1995.

*Michael F. Easley, Attorney General, by David F. Hoke, Assistant Attorney General, for the State.*

*Alexis C. Pearce for defendant-appellant.*

PARKER, Justice.

Defendant was tried capitally on indictments charging him with the first-degree murders of Bernadine Parrish and Bobbie Jean Hartwig. The jury returned verdicts finding defendant guilty of each count of first-degree murder on the theories of both premeditation and deliberation and felony murder. Following a sentencing proceeding pursuant to N.C.G.S. § 15A-2000, the jury recommended that defendant be sentenced to death for each murder, and the trial judge entered judgments accordingly. Execution was stayed on 18 June 1993 pending defendant's appeal. The jury also found defendant guilty of the first-degree kidnapping of Bernadine Parrish, the first-degree kidnapping of Bobbie Jean Hartwig, the first-degree rape of

Bernadine Parrish, the first-degree rape of Bobbie Jean Hartwig, and assault with a deadly weapon with intent to kill inflicting serious injury on Wesley Parrish. The trial court sentenced defendant to thirty years' imprisonment for kidnapping Bernadine Parrish, thirty years' imprisonment for kidnapping Bobbie Jean Hartwig, life imprisonment for raping Bernadine Parrish, life imprisonment for raping Bobbie Jean Hartwig, and fifteen years' imprisonment for assaulting Wesley Parrish with a deadly weapon with intent to kill inflicting serious injury, each sentence to run consecutively. For the reasons discussed herein, we conclude the pretrial hearings, jury selection, guilt-innocence phase, and sentencing proceeding of defendant's trial were free from prejudicial error; and the death sentences are not disproportionate.

The State's evidence tended to show that shortly after midnight on 24 August 1991, Wesley Parrish; his sister, Bernadine Parrish; and his girlfriend, Bobbie Jean Hartwig, were walking from where they lived in Grifton, North Carolina, to Ayden, North Carolina. The three lived in Grifton with Wesley's mother, Geraldine, and Bernadine's children. Wesley Parrish left a note for his mother telling her that the three had walked to Ayden to see an old boyfriend of Bernadine's. Wesley and Bernadine were each carrying a beer, and Bernadine also was carrying a cigarette case containing an identification card and her driver's license.

After walking several miles down Highway 11 towards Ayden, the three tried to catch a ride with a passing car. Three black men in a white four-door car stopped to pick them up.

The evidence tended to show that defendant and two friends, Kendrick Bradford and Richard Gonzales, were on their way from their barracks at Camp LeJeune in Jacksonville, North Carolina, to a club in Greenville, North Carolina. All three men had been drinking alcohol. Defendant, who was driving, passed by the victims, turned his car around, drove by them again, then turned his car around again, and stopped to pick up the victims. Wesley initially turned down the ride because he did not think everyone could fit in the car. The car drove off but stopped a short way down the road. Defendant got out of the car and called out to the victims that he would give them a ride anyway, and the three ran towards the car.

When they got to the car, Wesley noticed that the driver was holding a shotgun. Defendant told the victims to give him their money and

their wallets. Wesley and Bernadine gave defendant their beer huggers, but Bobbie Jean did not have anything with her to give him. Defendant then ordered the victims to get into the backseat of the car with Bradford. Defendant ordered Wesley to walk away from the car and go into the woods. When Wesley reached the edge of the woods, defendant shot him three times with the shotgun. Defendant got into the car and drove away.

Wesley was able to crawl to the road and eventually flag down a passing motorist. He was transported to Pitt Memorial Hospital, where he remained for seven days before being released. At the hospital, doctors removed six inches of his small intestine, which was damaged as a result of the shooting.

Defendant drove the car into a field near Pitt Community College, where it got stuck in a ditch. The men tried to remove it from the ditch. Defendant ordered the two women to go into a wooded area and take off their clothes. Defendant then raped Bobbie Jean Hartwig, while Bradford raped Bernadine Parrish. Both defendant and Bradford were armed during this time. Defendant then pointed the shotgun at Gonzales and ordered him to rape Bobbie Jean Hartwig. Defendant kept the gun pointed at Gonzales during this rape, and then defendant raped Hartwig again. Defendant then raped Bernadine Parrish while Bradford raped Bobbie Jean Hartwig.

After defendant raped Bernadine Parrish, he tried to strangle her and snapped her head back sharply. Gonzales checked her for a pulse but could not find one. Bernadine Parrish then regained consciousness, and defendant choked her and snapped her neck again. Bernadine Parrish lost control of her bodily functions and went silent. Defendant threw Bernadine's body into a ditch. Gonzales asked defendant why he killed Bernadine Parrish, and defendant informed him that he choked her "so we would never have to go to prison."

Defendant also tried to strangle Bobbie Jean and left her lying in the ditch. Defendant, Bradford, and Gonzales built a makeshift bridge out of ladders and a table top to get the car out of the ditch. They put the victims' clothes under the tires for traction. While they were trying to get the car out of the ditch, the men heard a scream from one of the women, later identified as Bobbie Jean Hartwig. Defendant asked Bradford if "he was going to take care of business." Bradford grabbed the pistol, but defendant told him not to take the pistol "because if you use the pistol you are going to have to shoot her three

or four times." Bradford then took the shotgun and shot Bobbie Jean Hartwig in the chest, getting blood on his clothes.

The men got the car out of the ditch and returned to Camp LeJeune. On the way back to Camp LeJeune, defendant was laughing; and someone made the comment, "What are we going to do to top this?" The next Monday, defendant approached Gonzales and threatened that if Gonzales ever "turned a trick" on defendant, Gonzales would be taken care of.

On 10 September 1991 the bodies of Bernadine Parrish and Bobbie Jean Hartwig were found by employees of Pitt Community College in a ditch near a building site on campus. Both bodies were badly decomposed. Autopsies revealed that Bobbie Jean Hartwig died from a gunshot wound to the chest and Bernadine Parrish died from undetermined homicidal violence. The stage of decomposition was so advanced that it was impossible to tell from the physical evidence whether the women had been raped.

A liquor bottle found at the scene of the murders had been sold at an exchange store at Camp LeJeune. A key ring with five keys was dropped at the scene. This key ring was later identified as belonging to Bradford, who had to be let into his barracks room at Camp LeJeune the morning of 24 August 1991 because he was not in possession of his room key. Hair samples taken from the backseat of the car which defendant had been driving the night of the murders were consistent with the hair of Bobbie Jean Hartwig.

Agent Ronald Marrs with the State Bureau of Investigation determined that the shotgun wadding found at the scene where Wesley Parrish had been shot was consistent with the spent shells found at the murder scene. The twenty-nine lead pellets collected during the autopsy of Bobbie Jean Hartwig were the same type of shot that would be fired from the spent shells found at the scene where Wesley Parrish was shot.

The State's evidence further tended to show that on 6 September 1991 Kendrick Bradford and Maurice Glover committed an armed robbery of a man who attempted to purchase drugs from them in downtown Greenville, North Carolina. Glover testified that while defendant was not a participant in the robbery, he saw defendant give the shotgun and pistol used in the robbery to Bradford. Defendant had hidden the shotgun in the ceiling in his barracks room at Camp LeJeune. Glover testified that defendant told him about committing

the shooting of Wesley Parrish and the kidnapping, rape, and murder of both Bernadine Parrish and Bobbie Jean Hartwig.

On the night of 7 September 1991, Bradford and defendant were spending the night at a house in Jacksonville. Pursuant to a robbery investigation, the Jacksonville police obtained entry into the house and found a .25-caliber pistol and a 12-gauge shotgun. Evidence at trial tended to show that the shotgun shells that killed Bobbie Jean Hartwig were fired by the same class of shotgun as that retrieved at the time of defendant's arrest.

While he was in Central Prison awaiting trial, defendant made a "fantasy confession" to Malik Shabazz, another inmate. In this "fantasy confession" defendant claimed that all of the information he gave Shabazz was merely fantasy and not true. In the statement defendant admitted shooting Wesley Parrish and leaving him for dead on the side of the road. He confessed to having sex with both victims and then killing one by strangling her. He indicated that one of his friends shot the other woman and that the men returned to Camp LeJeune. Shabazz voluntarily came forward with this information because he had a sister who had been murdered under similar circumstances.

Defendant put on no evidence during the guilt-innocence phase. At the close of all the evidence, defendant moved to have all the charges against him dismissed. The trial court denied this motion, and the jury found defendant guilty as charged on all counts.

Evidence relevant to the sentencing proceeding of defendant's capital trial will be addressed later in this opinion.

## PRETRIAL

[1] In his first assignment of error, defendant argues that the trial court abused its discretion by denying his pretrial motion for a change of venue or, in the alternative, a special venire. Defendant contends that the pretrial publicity surrounding this case made a fair trial in Pitt County impossible. Defendant argues that he was prejudiced by the trial court's denying his challenge for cause of juror Stanley based on pretrial publicity. Having exhausted all his peremptory challenges, defendant was unable to remove juror Stanley from his jury; and his motion for extra peremptory challenges was denied. Defendant claims that juror Stanley's answers to *voir dire* questions about pretrial publicity revealed that he would decide the case based on pretrial publicity and not solely on the evidence presented at trial.

STATE v. GREGORY

[340 N.C. 365 (1995)]

At a hearing on defendant's motion for change of venue, defendant presented evidence of substantial publicity about the case in Pitt County. In support of his motion, defendant introduced eight newspaper articles related to some aspect of his case, including one that discussed defendant's attempt to escape from the Pitt County jail while awaiting trial in this case. Defendant also presented the testimony of a local attorney and an investigator for the local Public Defender's Office, both of whom testified that this case had received extensive publicity in Pitt County and had been a popular topic of conversation in the community. After the trial court sustained the prosecutor's objections to his questions, defendant made an offer of proof that both men were of the opinion that defendant could not get a fair trial in Pitt County on account of pretrial publicity.

Although his motion for a change of venue was denied, the trial court ordered the exclusion of all potential jurors from Grifton Township, the township where the victims resided.

Defendant renewed his motion for a change of venue or special venire at a pretrial motions hearing on 23 March 1993. Defendant presented the testimony of Graham Clark, an attorney who represented codefendant Kendrick Bradford in his capital trial. Clark testified that the case had received extensive pretrial publicity in Pitt County, some of which focused on Bradford's claim at his trial that defendant was the most culpable perpetrator of the crimes. The trial court denied defendant's renewed motion but did allow individual questioning of jurors on the issue of pretrial publicity. He also stated that he would be very lenient in allowing challenges for cause if any of the jurors disclosed that they had been exposed to details from the Bradford trial placing the blame for the crimes on defendant.

The statute pertaining to change of venue motions provides:

If, upon motion of the defendant, the court determines that there exists in the county in which the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial, the court must either:

(1) Transfer the proceeding to another county in the prosecutorial district as defined in G.S. 7A-60 or to another county in an adjoining prosecutorial district as defined in G.S. 7A-60, or

(2) Order a special venire under the terms of G.S. 15A-958.

N.C.G.S. § 15A-957 (1988).

**STATE v. GREGORY**

[340 N.C. 365 (1995)]

The test for determining whether a change of venue motion based on pretrial publicity should be granted is whether "it is reasonably likely that prospective jurors would base their decision in the case upon pretrial information rather than the evidence presented at trial and would be unable to remove from their minds any preconceived impressions they might have formed." *State v. Jerrett,* 309 N.C. 239, 254-55, 307 S.E.2d 339, 347 (1983). Defendant has the burden to prove the existence of a reasonable likelihood that prejudice aroused by pretrial publicity makes him unable to receive a fair trial in a particular county. *State v. Yelverton,* 334 N.C. 532, 540, 434 S.E.2d 183, 187 (1993). Defendant must show that (i) jurors had prior knowledge concerning his case, (ii) he exhausted all of his peremptory challenges, and (iii) a juror objectionable to defendant on this ground sat on the jury. *State v. Jerrett,* 309 N.C. at 255, 307 S.E.2d at 347. The determination of whether defendant has shown that pretrial publicity prevented him from receiving a fair trial rests within the sound discretion of the trial court and will not be overturned absent a showing of an abuse of that discretion. *State v. Yelverton,* 334 N.C. at 540, 434 S.E.2d at 187.

"In deciding whether a defendant has met his burden of showing prejudice, it is relevant to consider that the chosen jurors stated that they could ignore their prior knowledge or earlier formed opinions and decide the case solely on the evidence presented at trial." *State v. Jerrett,* 309 N.C. at 255, 307 S.E.2d at 348. "Only in the most extraordinary cases can an appellate court determine solely upon evidence adduced prior to the actual commencement of jury selection that a trial court has abused its discretion by denying a motion for change of venue due to existing prejudice against the defendant." *State v. Madric,* 328 N.C. 223, 227, 400 S.E.2d 31, 33 (1991). The existence of pretrial publicity by itself does not establish a reasonable likelihood that defendant cannot receive a fair trial in the county where the crime was committed. *State v. Soyars,* 332 N.C. 47, 53, 418 S.E.2d 480, 484 (1992).

From our review of the transcript, we are satisfied that defendant failed to meet his burden of showing that pretrial publicity precluded him from receiving a fair and impartial trial in Pitt County. Defendant concedes that the newspaper articles submitted in support of his motion for change of venue were factual in nature. These newspaper articles related to the facts of the crimes, defendant's arrest, his subsequent escape attempt, and a petition circulated by the family of one of the victims seeking a speedy disposition of defendant's trial. None

of these articles was shown to be inflammatory or biased against defendant. "This Court has consistently held that factual news accounts regarding the commission of a crime and the pretrial proceedings do not of themselves warrant a change of venue." *State v. Gardner*, 311 N.C. 489, 498, 319 S.E.2d 591, 598 (1984), *cert. denied*, 469 U.S. 1230, 84 L. Ed. 2d 369 (1985).

Furthermore, the testimony of the two attorneys and the private investigator in support of defendant's motion indicates only that the trial had received media and word-of-mouth publicity in Pitt County. The testimony failed to establish that this publicity was inflammatory or prejudicial against defendant.

This Court has previously noted that the responses of prospective jurors to questions on *voir dire* are the best evidence of whether pretrial publicity was prejudicial or inflammatory. *State v. Richardson*, 308 N.C. 470, 480, 302 S.E.2d 799, 805 (1983). If each juror states unequivocally that he or she can set aside pretrial information about a defendant's case and reach a determination based solely on the evidence presented at trial, the trial court does not err by refusing to grant a change of venue. *State v. Moore*, 335 N.C. 567, 586, 440 S.E.2d 797, 808, *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 174, *reh'g denied*, —— U.S. ——, 130 L. Ed. 2d 532 (1994).

In the instant case, to assure a fair and impartial trial, the trial court allowed individual *voir dire* on the issue of pretrial publicity. The transcript reveals that twelve jurors and two alternates who ultimately sat on defendant's jury were thoroughly examined about their exposure to pretrial publicity. The transcript further reveals that each juror and alternate juror on defendant's jury unequivocally answered in the affirmative when asked if he or she could put aside any previous opinions about this case and decide defendant's case solely upon the evidence presented at trial.

[2] Defendant's claim that he was prejudiced by juror Stanley's presence on his jury is without merit. Juror Stanley was exposed only to general pretrial publicity about this case and was unfamiliar with any details other than the location of the victims' bodies when they were discovered. Although he expressed some initial concern with the difficulty of setting aside pretrial information, in the following exchange he unequivocally established that he could do so:

[PROSECUTOR]: . . . [A]re you able to say, sir, that you have— that you could set aside any previous opinions that you have

about this case and decide the case entirely and completely upon, ah, the evidence and the law as the Judge would relate it to you both as to the issue of guilt and innocence and punishment if we reach that point?

JUROR: Probably, yes.

[PROSECUTOR]: Does that mean you can, sir?

. . . .

JUROR: Yes.

[PROSECUTOR]: That is—and will you, sir? Will you set aside any previous opinion expressed or that you have about this case either as it relates to the guilt or innocence of the defendant or as it relates to punishment?

JUROR: Yes.

[PROSECUTOR]: And decide this case entirely and completely upon the evidence that comes out here in the courtroom in accordance with the Judge's instructions as to the law?

JUROR: Yes.

Later during *voir dire*, juror Stanley informed counsel for the defense that he understood the capital sentencing procedure and could be fair to defendant even if it was difficult. He again informed the trial court that he could and would set aside any previous opinions he may have had about defendant's case.

As defendant has failed to meet his burden of proof in connection with this issue, we reject his arguments; and this assignment of error is overruled.

**[3]** Next, defendant contends that the trial court erred by denying his pretrial motion to exclude two photographs depicting the victims at the time their bodies were discovered.

Defendant argues that the introduction of these photographs was intended solely to arouse the passions and prejudices of the jury against defendant. Both photographs depicted enlarged wounds to the body caused by decomposition and small animals. Defendant contends that these photographs of the victims' badly decomposed and mutilated bodies were not probative of the crime with which he was charged, noting the absence of any dispute about the cause of death of each victim or evidence that defendant mutilated either body.

STATE v. GREGORY

[340 N.C. 365 (1995)]

Defendant stipulated to the identity of the bodies depicted in the photographs and argues that the photographs were, therefore, unnecessary for identification purposes. He argues that these photographs were so prejudicial that he is entitled to a new trial. We reject defendant's arguments for the following reasons.

Whether to admit photographic evidence requires the trial court to weigh the probative value of the photographs against the danger of unfair prejudice to defendant. N.C.G.S. § 8C-1, Rule 403 (1992); *State v. Hennis*, 323 N.C. 279, 372 S.E.2d 523 (1988). This determination lies within the sound discretion of the trial court, and the trial court's ruling should not be overturned on appeal unless the ruling was "so arbitrary that it could not have been the result of a reasoned decision." *State v. Hennis*, 323 N.C. at 285, 372 S.E.2d at 526-27.

"Photographs of a homicide victim may be introduced even if they are gory, gruesome, horrible or revolting, so long as they are used for illustrative purposes and so long as their excessive or repetitious use is not aimed solely at arousing the passions of the jury." *Id.* at 284, 372 S.E.2d at 526. "Even where a body is in advanced stages of decomposition and the cause of death and identity of the victim are uncontroverted, photographs may be exhibited showing the condition of the body and its location when found." *State v. Wynne*, 329 N.C. 507, 517, 406 S.E.2d 812, 816-17 (1991).

The trial court did not abuse its discretion in admitting the photographs at issue. There is no evidence that these photographs were used excessively and solely to inflame the passions and prejudices of the jury against defendant. The photographs were in black and white, thereby lacking some of the gruesome characteristics of color photographs. They depicted the condition and location of the victims' bodies at the time they were found. Further, these photographs illustrated the testimony of Dr. Gilliland, the forensic pathologist who conducted the autopsies of the two bodies. Dr. Gilliland used these photographs to illustrate her testimony about the injuries inflicted on the victims, including testimony that it was impossible to determine from the autopsy whether the victims had been strangled or sexually assaulted due to the decomposition of the bodies. We cannot say that the trial court's decision to admit these photographs was so arbitrary that it could not have been supported by reason. This assignment of error is overruled.

STATE v. GREGORY

[340 N.C. 365 (1995)]

JURY SELECTION

**[4]** Defendant contends that the trial court abused its discretion by unduly restricting his *voir dire* of potential jurors. Defendant argues that the trial court repeatedly sustained the prosecutor's objections to various questions asked by defense counsel to prospective jurors, thereby violating defendant's constitutional rights to an informed exercise of peremptory challenges, a fair and impartial jury, and an individualized and nonarbitrary sentencing proceeding.

The purpose of *voir dire* is to ensure an impartial jury to hear defendant's trial. *State v. Bracey*, 303 N.C. 112, 119, 277 S.E.2d 390, 394 (1981). The *voir dire* of prospective jurors serves a two-fold purpose: (i) to determine whether a basis for challenge for cause exists, and (ii) to enable counsel to intelligently exercise peremptory challenges. *State v. Soyars*, 332 N.C. at 56, 418 S.E.2d at 486. The trial court has broad discretion to ensure that a competent, fair, and impartial jury is impaneled. *Id.* "[D]efendant must show prejudice, as well as a clear abuse of discretion, to establish reversible error." *State v. Syriani*, 333 N.C. 350, 372, 428 S.E.2d 118, 129, *cert. denied*, ⸺ U.S. ⸺, 126 L. Ed. 2d 341 (1993), *reh'g denied*, ⸺ U.S. ⸺, 126 L. Ed. 2d 707 (1994).

Defendant has not identified the specific questions to which he contends the prosecution's objections were erroneously sustained. "It is the uniform practice of this Court in every case in which a death sentence has been pronounced to examine and review the record with minute care to the end it may affirmatively appear that all proper safeguards have been vouchsafed the unfortunate accused before his life is taken by the State." *State v. Fowler*, 270 N.C. 468, 469, 155 S.E.2d 83, 84 (1967). A thorough review of the transcript reveals no abuse of discretion on the part of the trial court.

The trial court allowed inquiry into views that would render a juror unable to be fair to defendant, to consider the evidence, and to follow the law. The trial court also allowed extensive inquiry into the exposure of prospective jurors to pretrial publicity and the effect such publicity would have on their ability to give defendant a fair trial. Further, the trial court allowed inquiry as to whether a juror would automatically vote to impose the death penalty regardless of the facts and circumstances of defendant's case, as mandated by *Morgan v. Illinois*, 504 U.S. 719, 119 L. Ed. 2d 492 (1992). These questions were sufficient to reveal any bias that a prospective juror might have had and to ensure defendant a fair and impartial jury and a

nonarbitrary, individualized sentencing proceeding. The majority of defendant's questions to which the prosecutor's objections were sustained were either irrelevant, improper in form, attempts to "stake out" a juror, questions to which the answer was admitted in response to another question, or questions that contained an incomplete statement of the law. Defendant has shown no abuse of discretion on the part of the trial court, and this assignment of error is overruled.

[5] Next, defendant contends that the trial court erroneously failed to excuse prospective jurors who viewed the death penalty as the only appropriate punishment for first-degree murder. The trial court denied defendant's challenges for cause of prospective jurors Angel, Carson, Stanley, Rose, and Howell. Defendant contends the denial of these five challenges for cause was erroneous because each of these prospective jurors expressed a predisposition to vote for the death sentence in this case and indicated that he or she would be unable to consider the sentencing option of life imprisonment. Defendant argues that the trial court's denial of these challenges for cause violated his right to an impartial jury and a nonarbitrary sentencing hearing in violation of his state and federal constitutional rights. We disagree.

The standard for determining when a prospective juror may be properly excused for cause based on his views on capital punishment is whether those views would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589 (1980)). A careful review of the jury *voir dire* reveals no violation of this standard during jury selection.

The following exchange occurred during the *voir dire* examination of prospective juror Angel:

[DEFENSE COUNSEL]: Can you conceive of a case where you would think that life imprisonment would be the appropriate punishment in a first-degree murder case?

JUROR: Yes, I can conceive of them.

. . . .

[DEFENSE COUNSEL]: If you found the defendant guilty of first-degree murder would you then automatically vote to impose the death penalty?

JUROR: I'd have to outweigh (sic) all the facts before I made my decision.

[DEFENSE COUNSEL]: What do you mean by "outweigh all the facts"?

[PROSECUTOR]: Objection.

THE COURT: Sustained.

[DEFENSE COUNSEL]: If you found the defendant guilty of first-degree murder would you then automatically vote to impose the death penalty regardless of the facts and circumstances?

JUROR: Yes, I would.

[DEFENSE COUNSEL]: Move to challenge this witness (sic) for cause, Your Honor.

THE COURT: Denied.

[DEFENSE COUNSEL]: If you—if you found the defendant guilty of first-degree murder, would it be difficult for you to consider the aggravating and mitigating circumstances in this case?

JUROR: No.

. . . .

THE COURT: Mr. Angel [the juror], before I can allow Mr. Wells [defense counsel] to continue with his questions, you may have said this earlier but I wanted to make sure. Did you say that if the jury returned—if you were a part of the jury that returned a verdict of guilty of first-degree murder that you would automatically—simply because the defendant was found guilty of first-degree murder that you would automatically vote to impose the death sentence?

JUROR: No, I —

[THE COURT]: Did you mean to say that?

JUROR: No, I would have to outweigh (sic) them.

THE COURT: You would sit there and we would go into a second phase, as you —

JUROR: Right.

[THE COURT]: —understand it?

JUROR: Right.

THE COURT: And you would follow the law as I instructed the jury —

JUROR: Right.

[THE COURT]: —as it pertained to the second phase?

JUROR: Right.

[THE COURT]: And if after following the law and listening to the evidence, if you thought that life imprisonment was the appropriate punishment you would vote to impose life imprisonment; is that correct?

JUROR: Right.

[THE COURT]: And if you thought conversely, that death was the appropriate punishment after weighing the fact verses [sic] the law—or applying the facts to the law that you would vote for death; is that correct? Is that what you meant to say?

JUROR: Right.

This exchange demonstrates that this prospective juror was initially confused by defendant's questioning about the death penalty. Upon further questioning by the court, this prospective juror clearly expressed that he would not automatically vote to impose the death penalty regardless of the facts and circumstances but would listen to the evidence and follow the law by weighing any aggravating circumstances against any mitigating circumstances offered by defendant.

During *voir dire* about pretrial publicity, prospective juror Carson initially stated that he had heard talk about the case and that if a person was proven guilty of the crime, he should suffer the full extent of the law, which the juror understood to be the death penalty. Later during *voir dire*, after the prosecutor explained the sentencing proceeding to Carson, Carson stated that he would be able to consider both life imprisonment and the death penalty as possible punishments if defendant were found guilty.

The following exchange occurred during Carson's *voir dire* examination by defendant about his views on the death penalty:

[DEFENSE COUNSEL]: Um, Mr. Carson, could you tell me your beliefs concerning the death penalty?

STATE v. GREGORY

[340 N.C. 365 (1995)]

> JUROR: I think in a clear-cut crime where an individual is proven without a doubt to have taken another person's life, then the punishment for that crime after looking at all the circumstances involved should be the death penalty.

> [DEFENSE COUNSEL]: What—now, you said without a doubt; what if it was proved beyond a reasonable doubt?

> [PROSECUTOR]: Judge, I would object.

After the State's objection was sustained and defendant's counsel defined "beyond a reasonable doubt" to prospective juror Carson, the following colloquy then ensued:

> [DEFENSE COUNSEL]: Understanding that the standard of proof in the North Carolina courts is beyond a reasonable doubt, my question to you is if you sat as a juror and found the defendant guilty of first-degree murder using this standard of beyond a reasonable doubt, would you then automatically vote to impose the death penalty regardless of the facts and circumstances?

> JUROR: No.

> I can't—you have—at least the way I understand it, you have to look at all the facts, and the Judge explained there was [sic] three portions to the trial, right? So if you determine he's guilty, then you look at the mitigating and the aggravating evidence and determine which outweighs the other, as I understand it. In that case, if they were to bring up enough mitigating evidence to prove that, you know, there was some other facts that affected the crime, then we'd have to say that we should look at in the punishment stage something other than the death penalty. Have I missed the boat?

From these transcript excerpts, it is clear that prospective juror Carson was willing and able to set aside any opinion he may have had about the case and decide the case based solely on the evidence introduced at trial and pursuant to the trial court's instructions and Carson's oath as a juror. Carson specifically stated that he would not automatically vote for the death penalty but would weigh the aggravating circumstances against the mitigating circumstances to determine if another penalty was appropriate in this particular case.

Prior to the beginning of the jury *voir dire*, prospective juror Stanley informed the court that he thought he had made up his mind as to what sentence defendant should receive if convicted. Later dur-

ing the *voir dire*, after the State explained the capital sentencing proceeding to Stanley, Stanley informed the court that he could consider both life imprisonment and the death penalty as possible punishments if defendant was found guilty. He stated that he would be able to set aside any previous opinion about the case and base his decision entirely upon the evidence presented at trial in accordance with the trial court's instructions as to the law. When questioned by defense counsel, Stanley admitted that he had informed the court on the first day of jury selection that he thought he had already formed an opinion as to what sentence defendant should receive, but Stanley also indicated that after the capital sentencing procedure had been explained to him, he could be fair to defendant in deciding his punishment. The following exchange then occurred between the trial court and Stanley:

> [THE COURT:] The question, Mr. Stanley, is whatever opinion you may have had when you came up here on last week, I'm not sure whether it was—I think it was Wednesday in your case, can you now, after hearing basically what the law would be in this particular case, can you put that opinion aside and decide the guilt and innocence and any punishment in this case based solely upon the law and the evidence that comes out in the trial of this case; can you do that?
>
> JUROR: Yes.
>
> [DEFENSE COUNSEL]: So the next question is will you do that?
>
> JUROR: Yes.

As this excerpt makes clear, this prospective juror clearly indicated that he would be able to set aside his former opinion as to the appropriate penalty in this case and base his decision solely on the evidence presented at trial and in accordance with the law as given him by the trial court.

Defendant has failed to show that the views of any of these three prospective jurors would prevent or substantially impair the performance of his duties as a juror in this case. The trial court did not err in denying defendant's challenges for cause of prospective jurors Angel, Carson, and Stanley.

[6] Further, in connection with this assignment of error, we note that both prospective juror Rose and prospective juror Howell were excused from the jury for cause by the trial court. Prospective juror

Rose was dismissed by the trial court on its own motion after she informed the court that her young daughter was in counselling because of paranoia resulting from a recent break-in of Rose's home. Ms. Rose informed the court of her concerns that the details of this case would put her in a mental state where she would be unable to help her daughter in her therapy. Prospective juror Howell was excused for cause by the trial court on defendant's renewed motion during jury *voir dire*. There could not possibly have been any prejudice to defendant from the trial court's initial denial of defendant's motions to dismiss these two prospective jurors.

**[7]** Defendant next contends that the trial court erred in denying his request to rehabilitate jurors who indicated a reluctance to impose the death penalty. Defendant claims that prospective jurors Patterson, Clemons, and Tacozza were not adequately questioned about their views concerning the death penalty before being excused for cause.

Based on a defendant's right to a trial by an impartial jury, a juror may not be excused for cause merely because he "voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Witherspoon v. Illinois*, 391 U.S. 510, 522, 20 L. Ed. 2d 776, 784-85, *reh'g denied*, 393 U.S. 898, 21 L. Ed. 2d 186 (1968). However, a potential juror may correctly be excluded for cause because of his views on capital punishment when these views would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " *Wainwright v. Witt*, 469 U.S. at 424, 83 L. Ed. 2d at 851-52 (quoting *Adams v. Texas*, 448 U.S. at 45, 65 L. Ed. 2d at 589). A prospective juror with reservations about the death penalty must be able to state clearly that he is willing to put aside his own beliefs temporarily in deference to the rule of law. *Lockhart v. McCree*, 476 U.S. 162, 176, 90 L. Ed. 2d 137, 149 (1986).

A prospective juror's bias or inability to follow the law does not have to be proven with unmistakable clarity, and the decision as to whether a juror's views would substantially impair the performance of his duties is within the trial court's broad discretion. *State v. Locklear*, 331 N.C. 239, 248, 415 S.E.2d 726, 731-32 (1992). "[T]here will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law. . . . [T]his is why deference must be paid to the trial judge who sees and hears the juror." *Wainwright v. Witt*, 469

**STATE v. GREGORY**

[340 N.C. 365 (1995)]

U.S. at 426, 83 L. Ed. 2d at 852-53. "[W]here the record shows the challenge is supported by the prospective juror's answers to the prosecutor's and court's questions, absent a showing that further questioning would have elicited different answers, the court does not err by refusing to permit the defendant to propound questions about the same matter." *State v. Gibbs*, 335 N.C. 1, 35, 436 S.E.2d 321, 340 (1993), *cert. denied*, —— U.S. ——, 129 L. Ed. 2d 881 (1994).

Applying the foregoing principles to the facts of this case, it is clear that the trial court did not abuse its discretion by dismissing these prospective jurors for cause or by denying defendant's requests to rehabilitate them.

The transcript reveals that after the prosecutor explained the capital sentencing procedure to the entire panel, he went through each step of the procedure with the prospective jurors individually in order to determine whether they would be able to follow the procedure and correctly apply the law. First, the prosecutor asked the prospective jurors whether they would be able to return a guilty verdict in this case knowing that the death penalty was a possible sentence. Then, the prosecutor asked each prospective juror if he or she had any religious or personal beliefs against the death penalty. Next, the prosecutor asked the prospective jurors if they could vote for the death penalty if they were satisfied from the evidence beyond a reasonable doubt that (i) at least one aggravating circumstance existed; (ii) any aggravating circumstances outweighed any mitigating circumstances; and (iii) these aggravating circumstances were sufficiently substantial to call for a death sentence. Finally, the prosecutor asked the prospective jurors if they would be able to vote for a life sentence if they were not satisfied beyond a reasonable doubt of these three things.

Prospective juror Patterson's responses to the prosecutor's questions about the death penalty revealed that she had both personal and religious beliefs against the death penalty and that as a result of these beliefs, she would be unable to recommend a sentence of death regardless of the facts and circumstances of this case. Patterson's answers unequivocally established that she would not vote to impose the death penalty under any circumstances, and defendant has failed to show that additional questioning would have resulted in different answers.

Prospective juror Clemons evinced some difficulty in understanding the prosecutor's questions about his ability to follow the law

during a capital sentencing hearing. Clemons' answers to the prosecutor's questions about the death penalty disclosed that he had religious or personal beliefs against the death penalty. Clemons' answers revealed that he would be unable to recommend a death sentence regardless of all the facts and circumstances in this case. These answers established that Clemons' views on the death penalty would substantially impair his ability to perform his duties as a juror, and defendant has made no showing that further questioning would have resulted in different answers.

In response to the prosecutor's questions about the death penalty, prospective juror Tacozza stated, "[M]y beliefs are that capital punishment is not correct." He further stated, "It would present a real conflict with my religious and—my religious beliefs. . . . What I would do at that time is conjecture, but I can tell you that it would present a real dilemma for me." When asked by the trial court if these personal and religious beliefs against the death penalty would prevent or substantially impair his ability to perform his duties as a juror, Tacozza stated, "I believe they would." These answers clearly established that Tacozza was excludable for cause because of his views on the death penalty. Defendant has made no showing that further questioning would have resulted in different answers.

As the trial court did not err in excluding these three jurors for cause or by denying defendant's request to rehabilitate each of them, this assignment of error is overruled.

[8] Defendant next argues that the prosecutor violated his federal and state constitutional rights by using peremptory challenges to exclude prospective black jurors on the basis of race. The trial court denied defendant's objections to the peremptory challenges of prospective jurors Copeland, Barrett, Rogers, Keys, and Dickens. Defendant argues that since the victims were white women and defendant is a black male, racial prejudice could easily have come into play in this case. He contends that the prosecutor peremptorily challenged five prospective black jurors in an attempt to reduce the active participation of the black community in defendant's trial as much as possible.

Defendant further argues that the trial court applied the wrong standard in overruling his objections to these challenges and improperly put the burden on defendant to show that the jurors were excluded solely on the basis of their race. Defendant argues that his constitutional rights were violated as long as the prosecutor's exer-

cise of peremptory challenges was motivated at least in part by a racially discriminatory purpose, regardless of the prosecutor's other motives. Defendant maintains that there was ample evidence from which the trial court could have found that one of the prosecutor's motives for peremptorily challenging black prospective jurors was for the racially discriminatory purpose of reducing black representation on defendant's jury.

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 26 of the North Carolina Constitution forbid the use of peremptory challenges for a racially discriminatory purpose. *Batson v. Kentucky*, 476 U.S. 79, 86, 90 L. Ed. 2d 69, 80 (1986); *State v. Williams*, 339 N.C. 1, 15, 452 S.E.2d 245, 254 (1994).

In *Hernandez v. New York*, 500 U.S. 352, 114 L. Ed. 2d 395 (1991), the United States Supreme Court set forth the three-step process for evaluating claims of racial discrimination under *Batson v. Kentucky*. First, defendant must make a *prima facie* showing of purposeful discrimination in the State's exercise of peremptory challenges. *Id.* at 358, 114 L. Ed. 2d at 405. Once such a showing is made, the State must come forward with race-neutral reasons for the peremptory challenges at issue. *Id.* at 358-59, 114 L. Ed. 2d at 405. Finally, the trial court must determine if defendant has proved purposeful discrimination in the State's exercise of peremptory challenges. *Id.* at 359, 114 L. Ed. 2d at 405.

To make a *prima facie* showing of purposeful discrimination, the defendant must show only that relevant circumstances raise an inference that the prosecutor exercised his peremptory challenges to remove potential jurors solely because of their race. *State v. Robinson*, 330 N.C. 1, 15, 409 S.E.2d 288, 296 (1991); *see State v. Quick*, 341 N.C. 141, 144, 462 S.E.2d 186, 188 (1995). Only if such a *prima facie* case is made does the burden shift to the State to provide race-neutral reasons for the peremptory challenges at issue. *Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88.

This Court has identified several relevant factors in determining whether a defendant has raised an inference of purposeful discrimination. These factors include the defendant's race, the victim's race, and the race of the State's key witnesses. *State v. Ross*, 338 N.C. 280, 285, 449 S.E.2d 556, 561 (1994). Other factors include whether the prosecutor made racially motivated statements or asked racially motivated questions of black prospective jurors and whether there was a discernable difference in the prosecutor's method of question-

ing black prospective jurors that raises an inference of discrimination. *Id.* Another factor is whether the prosecutor used a disproportionate number of peremptory challenges to strike black jurors in a single case. *Id.* Although not dispositive, one factor tending to refute an allegation of purposeful discrimination is the acceptance rate of black jurors by the prosecution. *Id.*

In the instant case, although defendant is a member of a cognizable racial group and the prosecutor exercised peremptory challenges to remove blacks from defendant's jury, defendant has failed to make a *prima facie* showing of purposeful discrimination because the facts and circumstances of the case do not raise an inference of purposeful discrimination.

The record reveals that defendant's jury consisted of nine white jurors and three black jurors. Of the sixty-one potential jurors in this case, twelve were black. Of these twelve, four were excused for cause. Five black prospective jurors were peremptorily challenged by the State. However, the prosecutor accepted the other three blacks who were in the jury venire. These three black prospective jurors actually sat on defendant's jury. The prosecutor exercised a total of ten peremptory challenges, five against whites and five against blacks.

The State's primary witness against defendant was also a black male, a fact which tends to refute defendant's arguments that the prosecution was attempting to remove blacks from the jury assuming they might have been more favorable to defendant because of his race.

Nothing in the prosecutor's questions or his statements in the exercise of his peremptory challenges of black jurors revealed any discriminatory motive. The prosecutor did not ask any questions of a racial nature. There was no discernable difference in the prosecutor's method of questioning any black prospective jurors from the method of questioning the rest of the jury venire.

The facts and circumstances revealed during jury selection establish substantial reasons other than purposeful discrimination for each peremptory challenge at issue. The record reveals that prospective juror Copeland specifically informed the court that she realized the seriousness of the case and did not want to sit on the jury and have to make a determination about this case unless she had no other choice. Prospective juror Barrett did not drive and had to be brought

to the courthouse by the Sheriff's Department each day. She informed the court that she felt hassled by members of the Sheriff's Department because some of them were giving her a difficult time about picking her up and driving her to court each day. Prospective juror Rogers informed the court that he would have to drop out of college for the current quarter if he sat on this jury because he would miss several tests and pre-registration for other classes. Prospective juror Keys' son had felonies currently pending against him in Pitt County, which were to be heard in the same courthouse where defendant's trial was being conducted. Prospective juror Dickens had previously been charged with carrying a concealed weapon; this charge had been dismissed by one of the prosecutors in defendant's case.

The trial court did not err in ruling that defendant had not established a *prima facie* case of racial discrimination in this case. The trial court properly applied the standard as set forth in *Batson v. Kentucky* and its progeny and did not unfairly shift the burden of proof to defendant to prove that black jurors were excluded solely on account of their race. Defendant had the initial burden to establish a *prima facie* case of purposeful discrimination, a burden he failed to carry. Defendant's assignments of error in connection with these arguments are overruled.

GUILT-INNOCENCE

[9] Defendant next contends that the trial court erred by failing to intervene *ex mero motu* to declare that the plea bargain between the State and codefendant Richard Gonzales was void as against public policy and violated defendant's due process rights. Gonzales entered into a plea bargain with the State which allowed him to plead guilty to two counts of second-degree murder, two counts of first-degree kidnapping, one count of first-degree rape, one count of accessory after the fact to first-degree rape, and one count of accessory after the fact to assault with a dangerous weapon with intent to kill inflicting serious injury. In return Gonzales agreed to testify truthfully in the trials of defendant and codefendant Kendrick Bradford, in accordance with Gonzales' earlier statements to law enforcement officials about this case. Defendant contends that this plea agreement violated public policy and defendant's due process rights because it was conditioned not only on Gonzales' truthful testimony but also upon his testifying in accordance with his earlier statements to the police. Defendant argues that this unconstitutionally bound Gonzales to tes-

tify consistent with his earlier statements, which may not have been truthful, or lose the benefit of his plea bargain with the State. We reject defendant's arguments for the following reasons.

Defendant did not raise this issue at trial and as such has failed to preserve this issue for appellate review. N.C. R. App. P. 10(b)(1). However, even if defendant had properly preserved this issue, we conclude that this plea bargain did not violate either public policy or defendant's due process rights.

N.C.G.S. § 15A-1054 provides that

a prosecutor, when the interest of justice requires, may exercise his discretion . . . to agree to charge reductions, or to agree to recommend sentence concessions, upon the understanding or agreement that the suspect will provide truthful testimony in one or more criminal proceedings.

N.C.G.S. § 15A-1054 (1988). The plea bargain between Gonzales and the State complies with this statute. Gonzales, through his attorney, gave statements to the police inculpating himself, defendant, and Kendrick Bradford in these crimes. He pled guilty of his own free will, fully understanding and accepting his plea arrangement. During his testimony during defendant's trial, the details of Gonzales' plea bargain arrangement with the State were revealed to the jury, and he was cross-examined about it by counsel for the defense.

Although Gonzales did in fact testify consistent with his prior statements to the police, nothing in the transcript or the record supports defendant's claims that the plea arrangement was conditioned on anything other than Gonzales' providing truthful testimony against defendant and Bradford, such as he had done in his prior statements. Although the wording of the plea agreement could have been more articulately phrased, it is clear from the context of the agreement that Gonzales' plea bargain was conditioned only on his truthful testimony at trial. This assignment of error is overruled.

[10] Next, defendant contends that the trial court erred by admitting into evidence a "fantasy statement" implicating defendant in these crimes made by defendant to another inmate while in Central Prison. Defendant further argues the trial court erred by denying defendant's motion for a mistrial based upon the admission of this evidence. Defendant contends that this statement was hearsay not falling within any hearsay exception. He further contends that any probative value of this statement was outweighed by the danger of unfair prej-

STATE v. GREGORY

[340 N.C. 365 (1995)]

udice to defendant. Defendant argues that the admission of this evidence violated Rule 401 of the North Carolina Rules of Evidence and both the state and federal Constitutions. We reject defendant's arguments for the following reasons.

A statement made by defendant and offered by the State against him is admissible as an exception to the hearsay rule as a statement of a party-opponent. N.C.G.S. § 8C-1, Rule 801(d)(A) (1992). Defendant's statement to Shabazz clearly implicates defendant in these crimes, and his attempt to couch this confession in terms of make believe and fantasy does not render his inculpatory statement inadmissible hearsay.

Further, defendant's claim that this evidence was irrelevant and inadmissible under Rule 401 of the North Carolina Rules of Evidence is without merit. That rule defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (1992). Defendant's statement is clearly relevant in that it details defendant's participation in the shooting of Wesley Parrish and in the kidnapping, rape, and murder of both Bernadine Parrish and Bobbie Jean Hartwig.

"Whether to exclude relevant but prejudicial evidence under Rule 403 is a matter left to the sound discretion of the trial court." *State v. Handy*, 331 N.C. 515, 532, 419 S.E.2d 545, 554 (1992). We conclude that the trial court did not abuse its discretion in admitting defendant's statement to Shabazz into evidence. As this evidence was properly admitted at trial, there was no error in the trial court's refusal to grant defendant's motion for a mistrial on this basis.

SENTENCING

The State resubmitted all the evidence from the guilt-innocence phase at sentencing.

Defendant's evidence at sentencing tended to show that he was twenty-two years old at the time of the murders. Defendant testified that he grew up in Chicago and was involved with gangs while a child. Involvement in neighborhood gangs led him to convert to Islam. Defendant was also involved with martial arts and the Boy Scouts. His parents divorced, and he seldom saw his father after the divorce. He assumed the father role in his family.

Defendant testified that he did well in school when he was growing up and that he was involved in a program which allowed him to take some college courses on Saturdays while he was in elementary school. Defendant got into a lot of fights as a child. During one of these fights, defendant injured his head and suffered from memory losses. Defendant knew several people who died when he was a child, including an aunt. He testified that he had not cried since he was eleven years old.

After defendant graduated from high school, he enrolled in the Marines. Defendant claimed that he was involved in several incidents in which he and his friends were persecuted because of their race by other members of the Marines. After several of these incidents, defendant was involved in fights with other Marines.

Defendant married after his girlfriend became pregnant. Although the marriage lasted only three months because he found out his wife was having an affair, defendant's divorce did not become final until after he was imprisoned for the murders at issue in this case. Defendant also had a child by his girlfriend, Octavia Brice, but the child was not born until after defendant was incarcerated for the murders at issue in this case.

Defendant went to Saudi Arabia as part of Desert Storm on 24 December 1990. Defendant was the driver for the executive officer of his battalion. Defendant felt a great deal of conflict for serving in the Gulf War because he was fighting other Moslems and was in conflict with his religious morals. Defendant was particularly distressed when he found a picture in the wallet of a dead Saudi soldier showing his family. His unit had problems from lack of sleep and stress from being in the war zone.

After he returned from the Gulf War, defendant had a difficult time adjusting to being in the United States. He began to drink heavily and would stay up until he was exhausted on account of nightmares and caffeine addiction. He admitted that he began to receive some nonjudicial punishments for rules infractions in the Marines.

Defendant testified that he brought his brother down from Chicago to live near him in Virginia in order to keep him from being involved in a street gang.

Defendant claimed that while he was with Bradford and Gonzales the night of the murders, Bradford committed both killings and threatened defendant and Gonzales with harm if they told anyone.

Defendant admitted that although he did not shoot Wesley Parrish, he did buy the shotgun that was used to shoot Wesley Parrish. After the murders defendant experienced bad dreams about the victims but did not turn himself in to the police.

Defendant made several statements to the police. He initially denied that he had been with Bradford and Gonzales the night of the murders. In two later statements defendant claimed that he and Bradford had been in Virginia on the night of the murders. At trial defendant claimed that his last statement, in which he admitted to participating in the crimes, had been fabricated by the police.

Defendant admitted that after his initial incarceration in the Pitt County jail, he attempted to escape by hitting a police officer, chasing him around the jail, and getting the officer's keys. Defendant attempted to free other inmates before his attempt to escape was halted when he became locked between two sets of doors.

Defendant claimed to be suffering from post-traumatic stress disorder while in Central Prison awaiting trial. He was also dishonorably discharged from the Marines.

Dr. Henry Horacek, a psychiatrist, testified that at the time of the murders, defendant was suffering from psychosis, post-traumatic stress disorder, and the effects of chronic stimulant abuse and sleep deprivation. The month prior to the murders, there was a rapid deterioration in defendant's level of functioning. Dr. Horacek testified that defendant's ability to appreciate the criminality of his conduct and conform it to the requirements of the law was impaired at the time of the murders. Upon his return from Desert Storm, defendant had been similarly diagnosed by Dr. Cheran, who had prescribed Navane (antipsychotic drug) and Lithium (anti-manic drug), two of the strongest medicines used in psychiatry.

Dr. Horacek also testified that defendant was born prematurely and had a low birth weight. He explained that low birth-weight babies frequently have problems with hyperactivity, attention problems, and learning problems. Dr. Horacek testified that defendant was younger than his chronological age. He stated that defendant was immature as a child and would have been like an adolescent as a Marine.

On cross-examination Dr. Horacek admitted that defendant's discharge summary from Central Prison mental health hospital shortly after his arrest indicated that defendant was found to be nonsuicidal and nonpsychotic. Dr. Horacek admitted that defendant had initially

denied being at the crime scene the night of the murders. Dr. Horacek testified that the report of Dr. Samuel Blumenthal, who had administered psychophysical testing on defendant, indicated that defendant claimed to have an alibi for the day of the murders. Defendant's responses to a photograph revealed feelings of guilt on the part of defendant for shooting a man, which Dr. Blumenthal found to be indicative of an internal struggle that would be consistent with defendant's guilt. Dr. Horacek further testified that defendant could be dangerous if not medicated. He admitted that defendant "had some degree of ability to distinguish right from wrong" on the day of the murders.

Octavia Brice testified that she was defendant's girlfriend. She testified that after defendant returned from Desert Storm, he was a changed man who smoked, had headaches, and was depressed. He was always compassionate and sweet with her and was the father of her child.

Defendant's mother testified about his premature birth. She testified that after she separated from her husband, defendant assumed the role of the father in the family. She too claimed defendant was a changed man after he returned from the Gulf War; defendant smoked, drank, and stayed out all night.

The same five aggravating circumstances were submitted to the jury for each murder: (i) the murder was committed for the purpose of avoiding a lawful arrest, N.C.G.S. § 15A-2000(e)(4) (Supp. 1994); (ii) the murder was committed by defendant while he was engaged in the commission of a rape, N.C.G.S. § 15A-2000(e)(5); (iii) the murder was committed by defendant in the course of a kidnapping, N.C.G.S. § 15A-2000(e)(5); (iv) the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9); and (v) the murder was committed as part of a course of conduct in which defendant engaged and which included the commission by defendant of other crimes of violence against another person or persons, N.C.G.S. § 15A-2000(e)(11). The jury found the existence of all five aggravating circumstances.

The same thirty-four mitigating circumstances were submitted to the jury for each murder. The seven statutory mitigating circumstances submitted to the jury were (i) defendant's lack of a significant history of prior criminal activity, N.C.G.S. § 15A-2000(f)(1); (ii) the capital felony was committed while defendant was under the influence of a mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2); (iii) the defendant acted under duress or under the domination of

another person, N.C.G.S. § 15A-2000(f)(5); (iv) the capacity of defendant to appreciate the criminality of his conduct was impaired, N.C.G.S. § 15A-2000(f)(6); (v) the capacity of defendant to conform his conduct to the requirements of law was impaired, N.C.G.S. § 15A-2000(f)(6); (vi) the age of defendant at the time of the crime, N.C.G.S. § 15A-2000(f)(7); and any other circumstance arising from the evidence which one or more jurors found to have mitigating value, N.C.G.S. § 15A-2000(f)(9). The jury found the existence of only three of these statutory mitigating circumstances, namely, (i) that defendant had no significant history of prior criminal activity, (ii) that the capital felony was committed while defendant was under the influence of a mental or emotional distress, and (iii) any other circumstance which one or more jurors deemed to have mitigating value.

The jury found fourteen of the nonstatutory mitigating circumstances submitted by defendant and declined to find thirteen others.

Pursuant to N.C.G.S. § 15A-2000(b)(2), the jury unanimously found for both murders that the mitigating circumstances found were outweighed by the aggravating circumstances found. Further, pursuant to N.C.G.S. § 15A-2000(b)(3), when considered with the mitigating circumstances, the aggravating circumstances were sufficiently substantial to call for the imposition of the death penalty for both murders. Consequently, the jury recommended that defendant be sentenced to death for both murders.

[11] Defendant first contends that the trial court committed prejudicial error by denying his motion for a mistrial based on the trial court's improper expression of an opinion on the credibility of Dr. Henry Horacek, defendant's only expert witness.

During cross-examination by the State, Dr. Horacek indicated that he reviewed the statements of Richard Gonzales and Kendrick Bradford in forming his opinion about defendant's mental state at the time of the murders. After a bench conference in which defense counsel objected to the use of these statements during the cross-examination of Dr. Horacek, the following exchange occurred:

Q  Doctor, I'll hand you what's been marked for purposes of identification as State's Exhibit DDDD (sic), ah, and ask you if that—that is the—is that not the statement that you were provided of Kendrick—that's a photocopy of [a] statement that you were pro-

vided that Kendrick Wayne Bradford gave law enforcement officers, ah, and which you have just removed from your file?

A   Yes.

Q   And that, ah, is a statement that you read and considered in the course of making your evaluation; is that not true, sir?

A   No, that's not true.

Q   You didn't read it?

A   I glanced over it with some interest but I didn't use it as a basis for my opinion.

. . . .

[THE COURT:] Madam Clerk, would it be—I'm sorry, Madam Court Reporter, would it be possible for you to read back the witness'—the question by Mr. Haigwood [the prosecutor] and the witness's answer prior to us having a bench conference?

COURT REPORTER: (Nods head).

THE COURT: Would you do that.

COURT REPORTER: "Question: You, ah, indicate—indicated also, sir, that as a part of your review in forming your opinion that you, ah, went over the statements and testimony of Richard Gonzales and Kendrick Bradford? Answer: Yes. Question: Ah, do you have those, sir? Answer: Yes, I do."

THE COURT: Now, which is it Doctor? Are you telling the truth now or were you telling the truth then?

The jury was then sent out of the courtroom, and the trial court further questioned Dr. Horacek about his seemingly inconsistent answers.

Before the jury was brought back into the courtroom, defendant moved for a mistrial based on the court's question of Dr. Horacek in the jury's presence which defendant contended expressed an opinion as to the truthfulness of the witness. The trial court denied defendant's motion. After the jury returned to the courtroom, the trial court gave the jury the following curative instruction:

THE COURT: Members of the jury, prior to your leaving the courtroom the Court, that being myself, I asked a question of the witness, Mr.—Doctor—the Doctor and at this time I'd say to the

jury to disregard any question that I asked the witness. Also, I would say to you that I have no opinion as to the truthfulness or the credibility of (sic) the veracity of this particular witness, and you are not to in any way interpret any question that I may have asked as indicating I have an opinion as to his veracity or truthfulness. So simply disregard any question that I may have asked the witness. Understood?

The trial court refused to allow the prosecutor to have the witness read the statements made by Bradford and Gonzales and limited cross-examination of Dr. Horacek to why he did not use the statements as a basis for his opinion. Dr. Horacek testified that he had in fact read the statements made by Gonzales and Bradford but that he did not form any opinion on their consistency or inconsistency with defendant's own version of the events the night of the murders. He further testified that he gave the most weight to information about defendant before and after the murders and disregarded the statements about the events of the night of the murders because he was not present and had no idea whether the statements were true.

Defendant contends that the trial court's question of Dr. Horacek was erroneous because it gave the jury the impression that the trial court thought the witness was being untruthful. He claims that except for this comment, no other reasonable explanation exists for the jury's failure to find several mitigating circumstances supported by Dr. Horacek's testimony. Defendant argues that the jury instruction given by the trial court to disregard the question did not cure this error and that the trial court committed prejudicial error by denying his motion for a mistrial. Relying on *State v. Rhodes*, 290 N.C. 16, 23, 224 S.E.2d 631, 636 (1976), defendant argues that any intimation by the trial court in the presence of the jury that it thinks a witness is lying constitutes reversible error.

In *State v. Rhodes* this Court outlined the special hazards that may result from judicial warnings to a witness regarding perjury. These special hazards include (i) the danger that the trial court will invade the province of the jury to assess the credibility of the witness and determine the facts from the evidence presented; (ii) the danger that the trial court's comments may cause a witness to change his testimony to fit the judge's interpretation of the facts or refuse to testify at all; (iii) the danger that the trial court's warning regarding perjury may intimidate or discourage the defendant's attorney from eliciting essential testimony from a witness; and (iv) the danger that defend-

ant's due process right to a trial by a fair and impartial jury may be violated. *Id.* at 24-27, 224 S.E.2d at 636-38.

After a thorough review of the transcript, we agree with defendant that the trial court erred in asking Dr. Horacek, "Are you telling the truth now or were you telling the truth then?" This clearly conveyed to the jury that the trial court did not believe this witness was being truthful, in violation of N.C.G.S. § 15A-1222. The trial court's question created the hazard that the trial court had invaded the province of the jury to determine the credibility of this witness.

However, not every ill-advised comment by the trial court tending to impeach a witness constitutes reversible error. Unless the comment might reasonably have had a prejudicial effect on defendant's trial, the error will be considered harmless. *State v. Brady*, 299 N.C. 547, 560, 264 S.E.2d 66, 73-74 (1980). We conclude that any possible prejudice to defendant was cured by the trial court's subsequent instruction to the jury to ignore the question the trial court asked Dr. Horacek. Within a few moments of the improper comment, the trial judge explicitly informed the jurors that he had no opinion about Dr. Horacek's truthfulness or veracity and that they should not interpret his question as indicating any such opinion. During the final jury instructions, the trial court again instructed the jurors that they were the sole judges of the credibility of each witness and must decide for themselves whether to believe or disbelieve the testimony of any witness. Jurors are presumed to follow the trial court's instructions. *State v. Rouse*, 339 N.C. 59, 92, 451 S.E.2d 543, 561 (1994), *reconsideration denied*, 339 N.C. 619, 453 S.E.2d 188, *cert. denied*, —— U.S. ——, —— L. Ed. 2d ——, 64 U.S.L.W. 3241 (1995).

Further, after the curative instruction was given to the jury, Dr. Horacek was extensively questioned by the prosecutor about his reasons for disregarding the statements of defendant's two codefendants. Dr. Horacek was able to explain to the jury that although he read the statements when forming his opinion, he placed no weight on them because he was unsure of the truthfulness of all the statements. This resolved any confusion from his prior, apparently inconsistent statements and cured any prejudice to defendant from the trial court's question about Dr. Horacek's inconsistent statements.

A mistrial must be granted on defendant's motion "if there occurs during the trial an error or legal defect in the proceedings, or conduct inside or outside the courtroom, resulting in substantial and irreparable prejudice to the defendant's case." N.C.G.S. § 15A-1061 (1988).

The decision to grant a mistrial is within the trial court's sound discretion and will not be disturbed on appeal absent a clear showing of an abuse of such discretion. *State v. Bonney*, 329 N.C. 61, 73, 405 S.E.2d 145, 152 (1991). We conclude that since any possible prejudice to defendant from the trial court's question was cured by the court's later jury instructions, the trial court did not abuse its discretion by denying defendant's motion for a mistrial on this basis. This assignment of error is overruled.

[12] In a related assignment of error, defendant contends that the trial court abused its discretion by overruling defendant's objections to the prosecutor's repeated questioning of Dr. Horacek about the statements made by codefendants Bradford and Gonzales. Over defendant's objections the trial court allowed the prosecutor to repeatedly question Dr. Horacek about the consistency of these statements in comparison to defendant's statement about the murders. The defendant also objected to the prosecutor's repeated questions concerning Dr. Horacek's use of these statements in forming his opinion about defendant's mental condition.

Defendant argues that because Dr. Horacek testified that he did not use the statements of the defendant and his codefendants as a basis for his opinion, the evidence was not admissible as nonsubstantive basis-of-opinion evidence under Rule 705 of the North Carolina Rules of Evidence. Defendant further argues that the questioning was improper and that the evidence was not admissible as substantive evidence because it was irrelevant, especially since the guilt or innocence of defendant had already been decided. He argues that this error was not harmless for the reasons that the evidence provided the jury with information from which it could assume, first, that defendant had lied about his involvement in the murders and, second, that Dr. Horacek did not care whether defendant had lied to the police at the time of his arrest. Defendant argues that this evidence caused the jury to disbelieve Dr. Horacek's testimony about defendant's mental condition. We disagree.

The trial court refused to admit the content of the statements made by Bradford and Gonzales as substantive evidence or as nonsubstantive basis-of-opinion evidence under Rule 705 of the North Carolina Rules of Evidence. However, the trial court allowed the prosecutor to question Dr. Horacek about his reasons for reviewing these statements but not using them as a basis for his opinion testi-

mony, including questions about the consistency between the statements of Bradford and Gonzales and defendant's statement.

[The] North Carolina Rules of Evidence permit broad cross-examination of expert witnesses. N.C.G.S. § 8C-1, Rule 611(b) (1992). The State is permitted to question an expert to obtain further details with regard to his testimony on direct examination, to impeach the witness or attack his credibility, or to elicit new and different evidence relevant to the case as a whole. " 'The largest possible scope should be given,' and 'almost any question' may be put 'to test the value of his testimony.' " 1 Henry Brandis, Jr., *Brandis on North Carolina Evidence* § 42 (3d ed. 1988) (footnotes omitted) (citations omitted).

*State v. Bacon*, 337 N.C. 66, 88, 446 S.E.2d 542, 553 (1994), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 1083 (1995).

The prosecutor's questions of Dr. Horacek about his nonreliance on these statements were admissible not only to clarify his earlier inconsistent answers but to impeach his credibility. Dr. Horacek testified that in performing a psychiatric evaluation, "you rely on as many records as you can get." As discussed above, he testified that he reviewed all three statements when conducting his evaluation of defendant but that he did not rely on them as a basis for his opinion concerning defendant's mental condition. Evidence that Dr. Horacek reviewed these statements but chose not to rely on them as a basis for his opinion, including evidence that he knew the codefendants' statements contained versions of the events on the night of the murders different from defendant's statement, was relevant to impeach Dr. Horacek's expert testimony under Rule 611(b). N.C.G.S. § 8C-1, Rule 611(b) (1992). The trial court did not abuse its discretion in overruling defendant's objections to the prosecutor's questions of Dr. Horacek.

[13] Next, defendant contends that the trial court erred by submitting the aggravating circumstance that the murders were committed for the purpose of avoiding or preventing a lawful arrest. N.C.G.S. § 15A-2000(e)(4). Defendant argues that the evidence was insufficient to support the submission of this aggravating circumstance. We disagree.

In determining the sufficiency of the evidence to submit an aggravating circumstance, the trial court must consider the evidence in the

light most favorable to the State. *State v. Syriani*, 333 N.C. at 392, 428 S.E.2d at 140. The State is entitled to every reasonable inference to be drawn therefrom, and any discrepancies or contradictions in the evidence must be resolved in favor of the State. *Id.* " 'If there is substantial evidence of each element of the [aggravating] issue under consideration, the issue must be submitted to the jury for its determination.' " *State v. Moose*, 310 N.C. 482, 494, 313 S.E.2d 507, 516 (1984) (quoting *State v. Stanley*, 310 N.C. 332, 347, 312 S.E.2d 393, 401 (1984) (Martin, J., dissenting)).

Submission of this aggravating circumstance is proper when there is competent evidence from which the jury could infer that at least one of the defendant's reasons for committing a murder was to avoid detection and apprehension for his crimes. *State v. McCollum*, 334 N.C. 208, 219-20, 433 S.E.2d 144, 150 (1993), *cert. denied,* —— U.S. ——, 129 L. Ed. 2d 895, *reh'g denied,* —— U.S. ——, 129 L. Ed. 2d 924 (1994). The evidence in the instant case was sufficient to warrant the submission of this aggravating circumstance to the jury. Codefendant Gonzales testified that shortly after defendant choked and snapped the neck of Bernadine Parrish until she was dead, defendant told Gonzales that he killed her "so we would never have to go to prison." This statement was admissible against defendant as a statement of a party-opponent under Rule 801(d)(A). N.C.G.S. § 8C-1, Rule 801(d)(A). Further, evidence was before the jury that after Bobbie Jean Hartwig screamed, defendant told Bradford to "take care of business" and instructed him to use the shotgun instead of the pistol "because if you use the pistol you are going to have to shoot her three or four times." These statements were also admissible against defendant under Rule 801(d)(A). This evidence was sufficient to support the submission of the aggravating circumstance that these murders were committed for the purpose of avoiding or preventing a lawful arrest. This assignment of error is overruled.

[14] Next, defendant contends that the trial court erred by submitting the aggravating circumstances that each murder was committed while defendant was engaged in the commission of a rape. N.C.G.S. § 15A-2000(e)(5). Defendant argues that the trial court erred in submitting the underlying felony of rape as an aggravating circumstance for both murders at his sentencing hearing, as he had already been convicted of both rape charges. Defendant concedes that this issue has been considered and rejected by this Court but asks that we reconsider our prior holdings.

**STATE v. GREGORY**

[340 N.C. 365 (1995)]

When a murder is committed during one of the felonies enumerated in N.C.G.S. § 15A-2000(e)(5) and a defendant is convicted solely under the theory of premeditation and deliberation, the other felony may properly be admitted as an aggravating circumstance. *State v. Cherry*, 298 N.C. 86, 113, 257 S.E.2d 551, 568 (1979), *cert. denied*, 446 U.S. 941, 64 L. Ed. 2d 796 (1980). When a defendant is convicted of first-degree murder solely under the theory of felony murder, submission of the underlying felony as an aggravating circumstance is error. Proof of the underlying felony is an essential element of the State's proof of felony murder; thus, the underlying felony cannot provide a basis for additional punishment. *State v. Goodman*, 298 N.C. 1, 14-15, 257 S.E.2d 569, 579 (1979). When a defendant is convicted under both theories and both are supported by the evidence, submission of the underlying felony as an aggravating circumstance is proper. *Id.* at 15, 257 S.E.2d at 579.

Defendant in this case was convicted of two counts of first-degree murder upon both the theory of premeditation and deliberation and the theory of felony murder. Under our prior holdings submission of rape as an aggravating circumstance was proper. As defendant has not offered any reason to overrule these prior holdings, this assignment of error is overruled.

Defendant next contends that the trial court erred by submitting the aggravating circumstances that each murder was committed while defendant was engaged in the commission of a kidnapping. N.C.G.S. § 15A-2000(e)(5). Defendant contends that the trial court erred in submitting kidnapping as an aggravating circumstance in each murder, defendant having already been convicted of two counts of kidnapping the victims. Again, defendant concedes that this issue has previously been decided against him. For the reasons stated in the preceding issue, this assignment of error is overruled.

[15] Next, defendant contends that the trial court erred by submitting the aggravating circumstances that each murder was especially heinous, atrocious, or cruel. N.C.G.S. § 15A-2000(e)(9). The trial court instructed the jury about this aggravating circumstance in accordance with North Carolina Pattern Instruction section 150.10 as follows:

> In this context, heinous means extremely wicked or shockingly evil. Atrocious means outrageously wicked and vile, and cruel means designed to inflict a high degree of pain with utter indifference to or even the enjoyment of the suffering of others.

However, it is not enough that the murder be heinous, atrocious, or cruel, as those terms have just been defined. This murder must have been especially heinous, atrocious, or cruel. And not every—and not every murder is especially so.

For this murder to have been especially heinous, atrocious, or cruel, any brutality which was involved in it must have exceeded that which is normally present in any killing and this murder must have been a pitiless crime which was unnecessarily torturous to the victim.

Defendant contends that this instruction is overbroad, vague, and violates the defendant's rights to due process. Relying on *Godfrey v. Georgia*, 446 U.S. 420, 64 L. Ed. 2d 398 (1980), defendant argues that this instruction results in the arbitrary and capricious infliction of the death penalty because it fails to provide clear and easily applicable standards by which the jury can determine if this aggravating circumstance exists. Defendant concedes that this Court has repeatedly rejected this argument but asks that we reconsider our prior holdings.

In *State v. Syriani*, 333 N.C. at 391-92, 428 S.E.2d at 141, this Court held that this instruction provides constitutionally sufficient guidance to the jury because it incorporates narrowing definitions adopted by this Court and expressly approved by the United States Supreme Court. "Approved language includes the phrase 'the conscienceless or pitiless crime which is unnecessarily torturous to the victim.'" *Id.* at 389, 428 S.E.2d at 139 (quoting *Profitt v. Florida*, 428 U.S. 242, 255, 49 L. Ed. 2d 913, 924 (1976)). Other acceptable language includes the phrase "'the level of brutality exceeds that normally present in first-degree murder.'" *Id.* at 390, 428 S.E.2d at 140 (quoting *State v. Brown*, 315 N.C. 40, 65, 337 S.E.2d 808, 826 (1985), *cert. denied*, 476 U.S. 1165, 90 L. Ed. 2d 733 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988)).

The pattern jury instruction given in this case incorporates both the approved phrases above. In *State v. Rook*, 304 N.C. 201, 225, 283 S.E.2d 732, 747 (1981), *cert. denied*, 455 U.S. 1038, 72 L. Ed. 2d 155 (1982), this Court upheld a similar instruction incorporating these phrases conjunctively. As defendant has not provided any compelling reasons to overrule our prior holdings, this assignment of error is overruled.

[16] Next, defendant argues that the trial court erred by submitting the aggravating circumstances that each murder was committed by

defendant as part of a course of conduct involving the commission of other crimes of violence against other persons, N.C.G.S. § 15A-2000(e)(11). Defendant contends that the evidence was insufficient to support the submission of this aggravating circumstance.

Submission of this aggravating circumstance is proper when there is evidence that the victim's murder and other violent crimes were part of a pattern of intentional acts establishing that there existed in defendant's mind a plan, scheme, or design involving both the murder of the victim and other crimes of violence. *State v. Cummings*, 332 N.C. 487, 508, 422 S.E.2d 692, 704 (1992). "In determining whether to submit the course of conduct aggravating circumstance, the trial court must consider 'a number of factors, among them the temporal proximity of the events to one another, a recurrent *modus operandi*, and motivation by the same reasons.'" *State v. Lee*, 335 N.C. 244, 277, 439 S.E.2d 547, 564 (quoting *State v. Price*, 326 N.C. 56, 81, 388 S.E.2d 84, 98, *sentence vacated on other grounds*, 498 U.S. 802, 112 L. Ed. 2d 7 (1990)), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 162, *reh'g denied*, —— U.S. ——, 130 L. Ed. 2d 532 (1994).

In this case the evidence was sufficient to warrant the submission of the "course of conduct" aggravating circumstance to the jury. The evidence showed that defendant engaged in a violent course of conduct by kidnapping, raping, and murdering Bernadine Parrish and Bobbie Jean Hartwig early in the morning of 24 August 1991. He also shot and seriously wounded Wesley Parrish shortly before he kidnapped the two murder victims from the side of the road in rural Pitt County. This assignment of error is overruled.

**[17]** Defendant next contends that the trial court erred by failing to submit his requested mitigating circumstance for each murder which stated that codefendant Richard Gonzales would not receive the death penalty for his participation in these crimes pursuant to a plea bargain with the State. Defendant argues that the instruction was proper in law·and supported by the evidence. He contends that the general catchall phrase of N.C.G.S. § 15A-2000(f)(9), which permits the jury to consider any other circumstance arising from the evidence that has mitigating value, was insufficient to protect his rights under the law. Defendant concedes that this Court has previously rejected this argument but asks that we reconsider our prior holdings.

A mitigating circumstance is "a fact or group of facts which do not constitute any justification or excuse for killing or reduce it to a lesser degree of the crime of first-degree murder, but which may be

considered as extenuating, or reducing the moral culpability of the killing, or making it less deserving of the extreme punishment than other first-degree murders." *State v. Irwin*, 304 N.C. 93, 104, 282 S.E.2d 439, 447 (1981). In *Lockett v. Ohio*, 438 U.S. 586, 57 L. Ed. 2d 973 (1978), the United States Supreme Court held that any aspect of the defendant's character, record, or circumstance of the particular offense offered by the defendant as a mitigating circumstance must be considered by the jury. *Id.* at 604, 57 L. Ed. 2d at 990. However, evidence irrelevant to these factors may be properly excluded by the trial court. *Id.* at 604 n.12, 57 L. Ed. 2d at 990 n.12.

In *State v. Irwin* this Court considered *Lockett* in reaching its conclusion that the fact a codefendant received a lesser sentence is irrelevant and inappropriate for the jury's consideration as an aggravating circumstance. *State v. Irwin*, 304 N.C. at 104, 282 S.E.2d at 447. The Court stated that evidence of a codefendant's plea bargain and lesser sentence has "no bearing on defendant's character, record or the nature of his participation in the offense." *Id.*

In the instant case the fact of Gonzales' plea bargain was before the jurors, who were free to deem it to have mitigating value and consider it under N.C.G.S. § 15A-2000(f)(9). As defendant has provided no compelling reasons to abandon our prior holding, this assignment of error is overruled.

[18] Next, defendant contends that the trial court erred by denying his request that the court give peremptory instructions on twenty-three nonstatutory mitigating circumstances supported by uncontroverted evidence. Defendant concedes that four of his submitted nonstatutory mitigating circumstances were not supported by uncontroverted evidence and that he was not entitled to peremptory instructions thereon. We reject defendant's arguments.

If the evidence supporting a nonstatutory mitigating circumstance is uncontroverted and manifestly credible, the defendant is entitled to a peremptory instruction on that circumstance upon his request. *State v. Gay*, 334 N.C. 467, 492, 434 S.E.2d 840, 854 (1993). This is true for both statutory and nonstatutory mitigating circumstances. *Id.* at 493, 434 S.E.2d at 855.

"In order to be entitled to [a peremptory] instruction defendant must timely request it." *State v. Johnson*, 298 N.C. 47, 77, 257 S.E.2d 597, 618-19 (1979). The trial court is not required to determine on its own which mitigating circumstances are deserving of a peremptory

instruction. *Id.* From the foregoing it follows that in order to be sufficient, defendant's request for a peremptory instruction for mitigating circumstances must specify which circumstances are supported by uncontroverted evidence and, therefore, entitle him to a peremptory instruction.

In the instant case defendant did not specify for the trial court which nonstatutory mitigating circumstances were supported by uncontroverted evidence and, therefore, entitle him to a peremptory instruction. As he concedes, defendant was not entitled to peremptory instructions on four of his proposed nonstatutory mitigating circumstances because they were not supported by uncontroverted evidence. A thorough review of the transcript discloses that the evidence supporting five other proposed nonstatutory mitigating circumstances was also controverted. We conclude that the trial court was not required to sift through all the evidence and determine which of defendant's proposed mitigating circumstances entitle him to a peremptory instruction.

Further, we conclude that defendant's request for peremptory instructions was inadequate under *State v. Green*, 336 N.C. 142, 443 S.E.2d 14, *cert. denied,* —— U.S. ——, 130 L. Ed. 2d 547 (1994). In *State v. Green* we held that the same peremptory instruction is not proper for both statutory and nonstatutory mitigating circumstances. *Id.* at 174, 443 S.E.2d at 33. While the jury must accord mitigating value to a statutory mitigating circumstance supported by uncontroverted evidence, the jury may deem a nonstatutory mitigating circumstance supported by uncontroverted evidence to be without mitigating value. *Id.* Different peremptory instructions for statutory and nonstatutory mitigating circumstances must reflect this distinction. *Id.*

In the instant case the transcript does not indicate that defendant asked for different peremptory instructions for statutory and nonstatutory mitigating circumstances. Defendant made a general written request for peremptory instructions on all his requested mitigating circumstances. At the charge conference during the capital sentencing proceeding, defendant made the following general request of the trial court:

[DEFENSE COUNSEL]: We would also ask for peremptory instructions on each of our nonstatutory mitigating circumstances.

THE COURT: That's denied.

[DEFENSE COUNSEL]: And also the request Mr. Wells made as it relates to the statutory mitigating circumstances, 1 through, ah, 6.

THE COURT: What about it?

[DEFENSE COUNSEL]: That you peremptorily instruct the jury to answer yes to those—to those—I think Mr. Wells referred to the nonstatutory mitigating circumstances.

[DEFENSE COUNSEL]: As I understand it Your Honor is going to instruct the same in that as you did in Kendrick Bradford's case which is—the statutory, of course, that they only have to find one or more of us finds this to exist, so it will have the effect of a peremptory instruction that it has mitigating value. I think that's—I think Mr. Ward is just trying to nail that down.

As this excerpt of the transcript reveals, defendant did not clearly specify that he was seeking a different instruction for statutory and nonstatutory mitigating circumstances, nor did defendant propose a different peremptory instruction for the nonstatutory mitigating circumstances. In light of the foregoing, we conclude that the trial court did not err by denying defendant's request for peremptory instructions for the twenty-three nonstatutory mitigating circumstances at issue.

[19] Next, defendant argues that the trial court's instruction on the capital sentencing procedure unconstitutionally made the consideration of mitigating evidence discretionary with the jury during sentencing.

In connection with Issue Two, the court instructed the jurors that if one or more of them found a mitigating circumstance to exist, they should write yes in the space provided on the Issues and Recommendation as to Punishment sheet.

In connection with Issue Three, the court instructed the jury that if it found one or more mitigating circumstances, it must weigh the aggravating circumstances against the mitigating circumstances. The court then charged, "[w]hen deciding this issue, each juror may consider any mitigating circumstance or circumstances that the juror determined to exist by a preponderance of the evidence in issue two."

In the instructions for Issue Four, the trial court charged the jury that if it found beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances, it must also consider whether the aggravating circumstances were sufficiently

substantial to call for the imposition of the death penalty. The trial court instructed the jury that it must consider the mitigating circumstances when making this determination. The trial court then charged the jury that "[w]hen making this comparison each juror may consider any mitigating circumstance or circumstances that juror determined to exist by a preponderance of the evidence."

Defendant contends that the use of the word "may" in these instructions indicated to the jury that the consideration of mitigating evidence was discretionary in making these determinations. Defendant argues that although a jury may determine the weight to be given mitigating evidence, it cannot give such evidence no weight at all and exclude it from its consideration. *Eddings v. Oklahoma*, 455 U.S. 104, 114, 71 L. Ed. 2d 1, 11 (1982). He argues that these instructions allowed the jurors to disregard properly found mitigating circumstances.

This Court has repeatedly rejected virtually identical challenges to the use of the word "may" in the instructions for the consideration of mitigating evidence in Issue Three and Issue Four. In *State v. Lee*, 335 N.C. at 286-87, 439 S.E.2d at 569-70, this Court held that the pattern jury instructions, upon which the instructions in the instant case were based, do not make consideration of any mitigating evidence discretionary with the jurors. The Court indicated that these instructions clearly and unambiguously instruct the jury that it must weigh the mitigating circumstances against the aggravating circumstances and that the sentences in which the word "may" is used merely "describe[] which mitigating circumstances are to be considered by the jurors in this weighing process." *Id.* at 287, 439 S.E.2d at 569. "The word 'may' indicates that each juror is allowed to consider those mitigating circumstances that he or she may have found to exist by a preponderance of the evidence." *Id.* We conclude that the use of the word "may" did not make consideration of mitigating evidence discretionary with the jury.

Next, defendant argues that the instructions on the consideration of mitigating circumstances at Issue Three and Issue Four were improper because they failed to require that each juror consider mitigating circumstances found to exist by that juror personally. Defendant argues that the use of the word "may" allowed jurors who found mitigating circumstances to exist at Issue Two to disregard them at Issues Three and Four.

As we held above, the use of the word "may" does not make consideration of mitigating circumstances at Issues Three and Four discretionary and merely describes which mitigating circumstances are to be considered. In *McKoy v. North Carolina*, 494 U.S. 433, 435, 108 L. Ed. 2d 369, 376 (1990), the United States Supreme Court held that jurors may not be prevented from considering mitigating circumstances they personally found to exist, even if those circumstances are not found unanimously by the jury. The instructions at issue in this case required the jury to weigh the mitigating circumstances against the aggravating circumstances and did not prevent each juror from considering any mitigating circumstances which he or she personally found. The instructions were in accordance with the constitutional requirements of *McKoy*. Defendant's argument is overruled.

**[20]** Next, defendant argues that these instructions were improper because they failed to require each juror to consider every mitigating circumstance found by at least one juror. Defendant has failed to properly preserve this issue for appellate review by making it a basis for an assignment of error. N.C. R. App. P. 10(b)(1). Assignment of error fifty-five, to which defendant refers in his brief, is unrelated to any argument defendant makes in connection with these jury instructions. However, we have considered defendant's argument and find it to be without merit.

In *State v. Lee* this Court rejected a similar argument that each juror should be required to consider every mitigating circumstance found by any juror. The Court recognized that jurors cannot be precluded from giving effect to all mitigating evidence. *State v. Lee*, 335 N.C. at 286, 439 S.E.2d at 569 (citing *Mills v. Maryland*, 486 U.S. 367, 376, 100 L. Ed. 2d 384, 393 (1988)). The Court further recognized that a juror cannot be prevented from considering any mitigating evidence not unanimously found by the jury. *Id.* (citing *McKoy v. North Carolina*, 494 U.S. at 435, 108 L. Ed. 2d at 376). However, the Court held that these constitutional principles do not mandate that each juror must be required to consider every mitigating circumstance found by any juror, noting that such a holding would create an anomalous situation where all the jurors were required to consider a mitigating circumstance found by a single holdout juror. *Id.* at 287, 439 S.E.2d at 570. This Court concluded that the pattern jury charge, upon which the instant jury instructions were based, was sufficient because it did not preclude each juror from giving effect to all mitigating evidence he or she found to exist by a preponderance of the evidence. *Id.* As defendant has provided no compelling reasons to

abandon our prior holdings on this issue, defendant's argument is overruled.

[21] Next, in two related assignments of error, defendant contends that the trial court erred in instructing the jury as to the manner in which the jury should consider nonstatutory mitigating circumstances in Issue Two of the North Carolina capital sentencing procedure, thereby violating his state and federal constitutional rights. In accordance with the pattern jury instructions, the trial court instructed the jury that it must first find whether a nonstatutory mitigating circumstance existed and then consider whether that nonstatutory mitigating circumstance had value. Defendant argues that this allowed the jurors to determine that mitigating evidence was without value and to disregard it during their sentencing deliberations at Issues Three and Four. Defendant argues that this Court has recognized that the jury must give weight to statutory mitigating circumstances as a matter of law, and he contends that there is no constitutionally valid basis for treating nonstatutory mitigating circumstances any differently.

Defendant concedes that this issue has previously been decided against him but argues that this Court's prior holdings on this issue are no longer valid after the decisions of the United States Supreme Court in *Penry v. Lynaugh*, 492 U.S. 302, 106 L. Ed. 2d 256 (1989), and *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369.

In *Penry v. Lynaugh* the United States Supreme Court stated that the jury is constitutionally required to "consider and give effect to [mitigating] evidence in imposing sentence." *Penry v. Lynaugh*, 492 U.S. at 319, 106 L. Ed. 2d at 278. The Court based its holding in part on *Eddings v. Oklahoma*, 455 U.S. at 114, 71 L. Ed. 2d at 11, in which the Court held that the jury does not have the authority to accord found mitigating evidence no weight at all and exclude it from its consideration. In *McKoy v. North Carolina*, the United States Supreme Court held that the constitutional consideration of mitigating evidence in North Carolina occurs during Issues Three and Four and that each juror must be able to consider all mitigating evidence in making its deliberations on these issues. *McKoy v. North Carolina*, 494 U.S. at 442-43, 108 L. Ed. 2d at 381.

This Court rejected similar arguments to those raised by defendant in *State v. Williams*, 339 N.C. 1, 452 S.E.2d 245. This Court considered both *Penry* and *McKoy* in reaching its conclusion that the

pattern instructions for the consideration of nonstatutory mitigating circumstances are proper. This Court stated:

> While a juror may not be precluded from considering evidence proffered by defendant as a basis for a sentence less than death, *Lockett v. Ohio*, 438 U.S. 586, 57 L. Ed. 2d 973 (1978); *Penry v. Lynaugh*, 492 U.S. 302, 106 L. Ed. 2d 256 (1989); *Eddings v. Oklahoma*, 455 U.S. 104, 71 L. Ed. 2d 1 (1983); *McKoy v. North Carolina*, 494 U.S. 433, 108 L. Ed. 2d 369 (1990), a jury is not required to agree with a defendant that the evidence he proffers in mitigation is, in fact, mitigating, *Raulerson v. Wainwright*, 732 F.2d 803, 807, *reh'g denied*, 736 F.2d 1528 (11th Cir.), *cert. denied*, 469 U.S. 966, 83 L. Ed. 2d 302 (1984), unless the legislature has declared it to be mitigating as a matter of law. *State v. Fullwood*, 323 N.C. 371, 373 S.E.2d 518 (1988), *sentence vacated*, 494 U.S. 433, 108 L. Ed. 2d 602 (1990), *on remand*, 327 N.C. 473, 397 S.E.2d 226 (1990), *on remand*, 329 N.C. 233, 404 S.E.2d 842 (1991).

*State v. Williams*, 339 N.C. at 43-44, 452 S.E.2d at 270-71.

In *Williams* the Court noted that the basis for allowing the jury to determine whether a proffered nonstatutory mitigating circumstance has mitigating value is found in N.C.G.S. § 15A-2000(f)(9), the catchall circumstance under which nonstatutory mitigating circumstances are submitted to the jury. *Id.* at 44, 452 S.E.2d at 271. The jury properly finds a nonstatutory mitigating circumstance to exist if it finds that the evidence supports the existence of that circumstance and if it deems the circumstance to have mitigating value. *Id.*

This Court found it significant that in *McKoy*, the United States Supreme Court recognized without criticism the statutory procedure for consideration of nonstatutory mitigating circumstances:

> "In North Carolina's capital sentencing scheme, if the jury finds a statutory mitigating circumstance to be present, that circumstance is deemed to have mitigating value as a matter of law. *State v. Stokes*, 308 N.C. 634, 653, 304 S.E.2d 184, 195 (1983). For nonstatutory mitigating circumstances, the jury must decide both whether the circumstance has been proved and whether it has mitigating value. *See State v. Pinch*, 306 N.C. 1, 26, 292 S.E.2d 203, 223, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622, 103 S.Ct 474 (1982), citing *State v. Johnson*, 298 N.C. 47, 72-74, 257 S.E.2d 597, 616-617 (1979)."

*State v. Williams,* 339 N.C. at 45, 452 S.E.2d at 271 (quoting *McKoy v. North Carolina,* 494 U.S. at 441 n.7, 108 L. Ed. 2d at 379 n.7).

In light of the foregoing principles, we conclude that there is nothing constitutionally infirm with the pattern jury instruction, as given in this case, which allows jurors to determine in Issue Two if a nonstatutory mitigating circumstance has mitigating value. This instruction does not enable jurors to disregard mitigating evidence at either Issue Three or Four. Both of defendant's related assignments of error in connection with this instruction are overruled.

[22] Defendant next contends that the trial court erred by failing explicitly to instruct the jury that the age of defendant as a mitigating circumstance is not limited to his chronological age on the date of the crime but includes other factors such as his mental and emotional development, his judgment and maturity, and his prior experiences. The trial court instructed the jury on age as a mitigating circumstance as follows:

> 5. Consider whether the age of the defendant at the time of this murder is a mitigating factor.
>
> The mitigating effect[] of the age of the defendant is for you to determine from all of the facts and circumstances which you find from the evidence.
>
> If one or more of you finds by a preponderance of the evidence that the circumstance exists, you would so indicate by having your foreperson write yes in the space provided after this mitigating circumstance on the issues and recommendation form.
>
> If none of you finds this circumstance to exist, you would so indicate by having your foreperson write no in that space.

The mitigating circumstance of defendant's age may not be determined solely by reference to defendant's chronological age at the time of the crime, but rather it must be determined in light of "varying conditions and circumstances." *State v. Johnson,* 317 N.C. 343, 393, 346 S.E.2d 596, 624 (1986). Defendant argues that the trial court's instructions on the age mitigating circumstance, based on the pattern jury instructions, did not sufficiently explain what factors could be considered and may have misled the jury to believe that this mitigating circumstance does not include factors other than chronological age. He argues that as a result the jury may have failed to find age as a mitigating circumstance.

Defendant failed to object to this instruction at trial, and plain error analysis applies. *State v. Collins*, 334 N.C. 54, 62, 431 S.E.2d 188, 193 (1993). In order to rise to the level of plain error, the error in the trial court's instructions must be so fundamental that (i) absent the error, the jury would have reached a different verdict; or (ii) the error would constitute a miscarriage of justice if not corrected. *Id.* In this case, the jury was instructed that "[t]he mitigating effect[] of the age of the defendant is for you to determine from all the facts and circumstances which you find from the evidence." We conclude that this language did not limit the consideration of this mitigating circumstance solely to chronological age, but specifically instructed the jurors to consider all the facts and circumstances related to age that they found from the evidence. There is no error, much less plain error, in this instruction. This assignment of error is overruled.

[23] Defendant next contends that the trial court erred by allowing the State to pursue the death penalty against defendant because the State permitted codefendant Richard Gonzales to plead guilty to noncapital offenses for his participation in these crimes. Defendant argues that this difference rendered the death penalty arbitrary and capricious in defendant's case as Gonzales was equally responsible for all the crimes committed based upon the theory of "acting in concert." Although defendant raises this issue for the first time on appeal and has improperly preserved this issue for review, N.C. R. App. P. 10(b)(1), we have addressed this issue and have determined that the plea bargain at issue did not render defendant's death sentence arbitrary and capricious.

As discussed above, codefendant Richard Gonzales entered into a plea bargain with the State whereby he pled guilty to two counts of second-degree murder, two counts of first-degree kidnapping, one count of first-degree rape, one count of accessory after the fact to first-degree rape, and one count of accessory after the fact to assault with a deadly weapon with intent to kill inflicting serious injury. In exchange Gonzales agreed to testify truthfully against defendant and Kendrick Bradford at their trials.

The plea bargain between the State and Gonzales was in accordance with N.C.G.S. § 15A-1054, which specifically authorizes plea bargaining with criminal defendants in exchange for truthful testimony in other criminal proceedings. N.C.G.S. § 15A-1054(a). The constitutionality of this statute not having been raised or passed on by the trial court, that issue is not before this Court. *State v. Woods*, 307 N.C.

213, 219-20, 297 S.E.2d 574, 578 (1982). Defendant's contention is that the application of this statute in his case rendered his death sentence arbitrary and capricious since Gonzales thereby received a lesser sentence.

Disparity in the sentences imposed upon codefendants does not result in cruel and unusual punishment and is not unconstitutional. *State v. Atkinson*, 298 N.C. 673, 686, 259 S.E.2d 858, 866 (1979), *overruled on other grounds by State v. Jackson*, 302 N.C. 101, 273 S.E.2d 666 (1981). The details of the plea bargain between Gonzales and the State were before the jury, and Gonzales was cross-examined about the sentence he would receive for testifying against his codefendants. The jury was free to consider this evidence under the catchall mitigating circumstance in N.C.G.S. § 15A-2000(f)(9). Based on the foregoing, we conclude that defendant's death sentence was not rendered arbitrary or capricious by his codefendant's plea bargain with the State.

Next, defendant contends the trial court erred by failing to intervene to stop what defendant contends was the prosecutor's grossly improper closing argument. Defendant argues that when considered in its entirety, the prosecutor's closing argument was intended to inflame the passions and prejudices of the jury against defendant in violation of the death penalty statute and defendant's state and federal constitutional rights.

As defendant failed to object to any of these arguments at trial, they are reviewable only to determine whether they were so grossly improper that the trial court erred by failing to intervene *ex mero motu* to correct the errors. *State v. Sexton*, 336 N.C. 321, 349, 444 S.E.2d 879, 895, *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 429 (1994). "[T]he impropriety of the argument must be gross indeed in order for this Court to hold that a trial judge abused his discretion in not recognizing and correcting *ex mero motu* an argument which defense counsel apparently did not believe was prejudicial when he heard it." *State v. Johnson*, 298 N.C. 355, 369, 259 S.E.2d 752, 761 (1979).

A prosecutor in a capital trial is entitled to argue all the facts submitted into evidence as well as any reasonable inferences therefrom. *State v. McCollum*, 334 N.C. at 223, 433 S.E.2d at 152. Counsel are afforded wide latitude in arguing hotly contested cases, and the scope of this latitude lies within the sound discretion of the trial court. *State v. Soyars*, 332 N.C. at 60, 418 S.E.2d at 487.

We have considered each of the arguments to which defendant objects and find them all to be without merit.

[24] First, defendant contends that the prosecutor asked the jurors to place themselves in the position of the victims in the following argument:

> Ah, you know, there is no way that any of us, I guess, can show you any number of photographs or talk in any way to any great extent to put you in the same position and see those things that occurred on the evening of the 23rd and the morning of the 24th of August of 1991. Ah, I think, though, if you think and make a conscious effort to think about that evening and what happened that evening, that it was pure horror. Pure, unadulterated horror.
>
> Three people walking on the highway, one shot down like a dog in the ditch, the other two ladies forced in the car, driven a distance, the car running in a ditch, ladies forced to try to help move the car. Those ladies as you heard evidence about crying, hysterical, worried about one of them's (sic) mother and what effect shooting or potential shooting of the brother would have on her mother because of her mother's heart condition. Two women giving their bodies, raped, and raped. And then murdered. And not—murdered in a most vile way.
>
> Bernadine Parrish, strangled in the fashion that you heard. Ah, after being raped, she passes out, becomes conscious again, sits up, strangled again to the point that her—she looses control of her bodily functions and [is] then thrown in a ditch.
>
> Bobbie Jean Hartwig, raped and raped, strangled, thrown in a ditch, regains consciousness, screaming in the ditch after being strangled and then blown away in the chest with a shotgun.
>
> I guess you folks put yourselves and try to imagine—I don't believe any of us are capable of imagining the pure horror that was going on there particularly at the campus of Pitt Community College that night in that field and in that ditch.

In *State v. Artis*, 325 N.C. 278, 384 S.E.2d 470 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990), *on remand*, 329 N.C. 679, 406 S.E.2d 827 (1991), the victim was strangled to death. During closing argument at the sentencing hearing, the prosecutor asked the jurors to hold their breath for as long as they could over a four-minute period so they could " 'understand . . . the dynam-

ics of manual strangulation.' " *Id.* at 324, 384 S.E.2d at 496. Although the defendant in that case objected, his objection was overruled. On appeal this Court found no error, concluding that an argument "[u]rging the jurors to appreciate the 'circumstances of the crime' " is not improper during the penalty phase of a trial. *Id.* at 325, 384 S.E.2d at 497. In the instant case the transcript reveals that the prosecutor was merely urging the jurors to appreciate the circumstances of the crime. The prosecutor's argument related to the nature of defendant's crimes which is one of the touchstones for propriety in a capital sentencing argument. *State v. Brown*, 320 N.C. 179, 202-03, 358 S.E.2d 1, 17, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987). The prosecutor did not misstate or manipulate the evidence and did not ask the jurors to put themselves in the place of the victims. We conclude that the argument was not improper and that the trial court did not err by failing to intervene *ex mero motu* to prevent it.

[25] Next, defendant argues that the trial court erred by allowing the prosecutor to make several arguments to the jury based on victim-impact information. Defendant has not specified which arguments made by the prosecutor contained victim-impact statements. A review of the transcript disclosed the following alleged victim-impact arguments:

> I told you earlier there is nothing I can do to ease their pain and suffering those last few moments. Nothing I can do to ease the pain and suffering of everyone around them.
>
> It's [sic] nothing I can do to change the way that history will record their lives, not as two young ladies living in a small community, like we all do, but rather as those two ladies who were raped and murdered behind Pitt Community College. The visions of their faces on television screens and body bags being pulled from ditches records their lives now. I can't change that.
>
> They'll be known from now on as those two girls murdered behind Pitt Community College. That's just one of the many things that, um, Warren Gregory has done to these ladies, not only their—ending their lives but also ruining any memories that anyone had of them. So its [sic] little I can do about them. I can't change that.
>
> I can't change how they died, where they died. I can't relieve them of any of the pain. All I can do is try to say something, something that will convince you that justice must be done here.

Later in his closing argument, the prosecutor argued:

I'm the last person who will speak in this courtroom on behalf of these two people, Bernadine and Bobbie Jean. As you can imagine, I'm sure there are pictures of them growing up. I'm sure their mommas and boyfriends —

[DEFENSE COUNSEL]: Objection, Your Honor.

THE COURT: Overruled.

[PROSECUTOR]: I mean sometimes [the victims] get lost in these hearings in what it's all about. You know, this is my presentation. This is your life Bernadine. This is your life Bobbie Jean. You're those two girls who were murdered behind Pitt Community College and that's all you are. You don't have a life. You have nothing. That's all you are in this court today. And I'll put these in this box right here and we'll close them up, and that's one more case for the vault downstairs. You think about that.

They had a right to expect better. They had a right to a life that went beyond a muddy ditch behind Pitt Community College. They didn't die of cancer or a car wreck or something. . . .

They had a right to have a decent burial. Not a bunch of bones and skin. They had a right to have their parents and their children look at them in some funeral home somewhere.

In *Payne v. Tennessee*, 501 U.S. 808, 825, 115 L. Ed. 2d 720, 735, *reh'g denied*, 501 U.S. 1277, 115 L. Ed. 2d 1110 (1991), the United States Supreme Court upheld the use of victim-impact statements during closing arguments unless the victim-impact evidence is so prejudicial that it renders a trial fundamentally unfair. The prosecutor's statements in the instant case were made as a part of his argument that the deaths of the victims represented a unique loss to their families. *Id.* His argument stressed that the victims were dead and that defendant was the person responsible for their deaths. *Id.* The prosecutor's arguments about the location and condition of the victims' bodies was based on facts properly presented at trial. We conclude that these victim-impact statements did not render defendant's trial fundamentally unfair.

[26] Next, defendant contends that the prosecutor improperly attempted to argue that the jury should reject one of defendant's proffered mitigating circumstances in such a way as to win favor with the jury and influence its decision. The prosecutor argued that the pur-

pose of submitting the nonstatutory mitigating circumstance that defendant was convicted by the testimony of an accomplice was designed to influence the jury to question at sentencing whether it did the right thing by finding him guilty at the guilt-innocence phase of the trial. The prosecutor stated that he did not know how this was a mitigating circumstance since defendant had already been found guilty beyond a reasonable doubt.

In *State v. Artis,* 325 N.C. at 325, 384 S.E.2d at 497, this Court held that the prosecutor "is permitted to characterize and to contest the weight of proffered nonstatutory mitigating circumstances." In the instant case the prosecutor was properly characterizing and contesting the weight and validity of this nonstatutory mitigating circumstance. The prosecutor did not exceed the scope of the evidence or the wide latitude accorded to counsel in hotly contested cases, and the trial court did not err by failing to intervene *ex mero motu* to correct this argument.

[27] Next, defendant argues that the prosecutor attacked defendant's Moslem religion in an attempt to discredit his testimony. The prosecutor mentioned the nonstatutory mitigating circumstance that defendant served his country in a time of war despite the conflict with his religious beliefs. He then argued that defendant's religious belief was not "thou shalt not kill." The prosecutor argued that defendant's belief was "thou [shalt] not kill Moslems, that is, kill anybody else but not Moslems." We conclude that the prosecutor here was merely characterizing and contesting the weight of defendant's proffered nonstatutory mitigating circumstance. The prosecutor did not exceed the scope of the evidence or the wide latitude afforded counsel in hotly contested cases. The trial court did not err by failing to intervene *ex mero motu* to prevent this argument.

[28] Next, defendant argues that the prosecutor improperly argued lack of remorse and defendant's bad character as nonstatutory aggravating circumstances. The emphasis during the sentencing phase of a capital trial is on the circumstances of the crime and on defendant's character. *State v. Artis,* 325 N.C. at 325, 384 S.E.2d at 497; *State v. Oliver,* 309 N.C. 326, 360, 307 S.E.2d 304, 326 (1983). Defendant fails to cite to any pages in the transcript where this alleged error occurred. Our thorough review of the State's argument reveals that any references to defendant's lack of remorse or character were proper under *State v. Artis.*

STATE v. GREGORY

[340 N.C. 365 (1995)]

We conclude that there was no error in the trial court's failure to intervene *ex mero motu*. The particular arguments to which defendant objects did not rise to the level of gross impropriety so as to require the trial court to intervene *ex mero motu* to correct them.

## PRESERVATION ISSUES

Defendant raises four additional issues which he has denominated as preservation issues: (i) the trial court erred by denying defendant's pretrial motions for a bill of particulars; (ii) the trial court erred by denying defendant's pretrial motion to strike the death penalty from consideration; (iii) the trial court committed plain error by failing to conduct a *voir dire* of potential jurors concerning their understanding of the meaning of life imprisonment; and (iv) the trial court erred by instructing the jury that it had a duty to impose a death sentence. We have considered defendant's arguments with regard to these issues and have found no compelling reasons to depart from our prior holdings which defendant correctly recognizes are dispositive. *See State v. Ward*, 338 N.C. 64, 122, 449 S.E.2d 709, 742 (1994), *cert. denied*, —— U.S. ——, 131 L. Ed. 2d 1013 (1995). Defendant also lists as preservation issues that the trial court erred by denying defendant's pretrial motion to suppress his confession and the trial court erred by denying defendant's motion to dismiss all charges for insufficiency of the evidence. We note first that these issues are not proper preservation issues because they are not determined solely by principles of law upon which this Court has previously ruled. Rather, these assignments of error are fact specific requiring review of the transcript and record to determine if the assignment has merit. Where counsel determines that an issue of this nature does not have merit, counsel should "omit it entirely from his or her argument on appeal." *State v. Barton*, 335 N.C. 696, 712, 441 S.E.2d 295, 303 (1994). Nevertheless, we have thoroughly reviewed the transcript and record as to these assignments and have found no error. These two assignments of error are, therefore, without merit.

## PROPORTIONALITY

Having found defendant's trial and capital sentencing proceeding to be free of prejudicial error, we are required by N.C.G.S. § 15A-2000(d)(2) to review the record and determine: (i) whether the record supports the jury's finding of the aggravating circumstances upon which the court based its sentence of death; (ii) whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; and (iii) whether the death sentence is

excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. *State v. McCollum,* 334 N.C. at 239, 433 S.E.2d at 161.

The following five aggravating circumstances were submitted and found by the jury for each murder: (i) the murder was committed for the purpose of avoiding a lawful arrest, N.C.G.S. § 15A-2000(e)(4); (ii) the murder was committed while defendant was engaged in the commission of rape, N.C.G.S. § 15A-2000(e)(5); (iii) the murder was committed while defendant was engaged in the commission of kidnapping, N.C.G.S. § 15A-2000(e)(5); (iv) the murder was especially heinous, atrocious, or cruel, N.C.G.S. § 15A-2000(e)(9); and (v) the murder was a part of a course of conduct in which defendant engaged which included the commission by defendant of other crimes of violence against another person or persons, N.C.G.S. § 15A-2000(e)(11).

After a thorough review of the transcript, record on appeal, and briefs and oral arguments of counsel, we conclude that the jury's finding of each of these aggravating circumstances was supported by the evidence presented at trial. We have also determined that nothing in the record suggests that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor.

[29] Finally, we must consider "whether the punishment of death in this case is excessive or disproportionate to the penalty imposed in similar cases considering both the crime and the defendant." *State v. Davis,* 340 N.C. 1, 28, 455 S.E.2d 627, 641-42, *cert. denied,* —— U. S. ——, —— L. Ed. 2d ——, 64 U.S.L.W. 3243 (1995). The purpose of conducting proportionality review is "to eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden,* 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied,* 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). Proportionality review also serves "[a]s a check against the capricious or random imposition of the death penalty." *State v. Barfield,* 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied,* 448 U.S. 907, 65 L. Ed. 2d 1137, *reh'g denied,* 448 U.S. 918, 65 L. Ed. 2d 1181 (1980).

We compare this case to similar cases within a pool consisting of

*all cases* arising since the effective date of our capital punishment statute, 1 June 1977, which have been tried as capital cases and reviewed on direct appeal by this Court and in which the jury recommended death or life imprisonment or in which the trial court

imposed life imprisonment after the jury's failure to agree upon a sentencing recommendation within a reasonable period of time.

*State v. Williams*, 308 N.C. 47, 79, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177, *reh'g denied*, 464 U.S. 1004, 78 L. Ed. 2d 704 (1983). "Only cases found to be free from error in both the guilt-innocence and sentencing phases are considered in conducting this review." *State v. Conaway*, 339 N.C. 487, 538, 453 S.E.2d 824, 856 (1995).

In *State v. Bacon*, 337 N.C. 66, 446 S.E.2d 542, this Court clarified the composition of the pool so as to account for post-conviction relief awarded to death-sentenced defendants:

Because the "proportionality pool" is limited to cases involving first-degree murder convictions, a post-conviction proceeding which holds that the State may not prosecute the defendant for first-degree murder or results in a retrial at which the defendant is acquitted or found guilty of a lesser included offense results in the removal of that case from the "pool." When a post-conviction proceeding results in a new capital trial or sentencing proceeding, which, in turn, results in a life sentence for a "death-eligible" defendant, the case is treated as a "life" case for purposes of proportionality review. The case of a defendant sentenced to life imprisonment at a resentencing proceeding ordered in a post-conviction proceeding is similarly treated. Finally, the case of a defendant who is either convicted of first-degree murder and sentenced to death at a new trial or sentenced to death in a resentencing proceeding ordered in a post-conviction proceeding, which sentence is subsequently affirmed by this Court, is treated as a "death affirmed" case.

*Id.* at 107, 446 S.E.2d at 564.

Our consideration on proportionality review is limited to cases roughly similar as to the crime and the defendant, but we are not bound to cite every case used for comparison. *State v. Syriani*, 333 N.C. at 400, 428 S.E.2d at 146.

Characteristics distinguishing the instant case include: (i) the repeated raping of the two victims, (ii) the repeated attempts to kill both victims, (iii) fear on the part of the victims who were kidnapped and held at gunpoint, and (iv) multiple murders committed to avoid arrest.

STATE v. GREGORY

[340 N.C. 365 (1995)]

Defendant was convicted of both first-degree murders on the theories of premeditation and deliberation and felony murder. He was also convicted of one count of assault with a deadly weapon with intent to kill inflicting serious injury, two counts of first-degree kidnapping, and two counts of first-degree rape. For each murder the jury found each of the five submitted aggravating circumstances.

Of the thirty-four mitigating circumstances submitted, the jury found seventeen. While seven statutory mitigating circumstances were submitted, only three were found. The three statutory mitigating circumstances that were found were: (i) the defendant has no significant history of prior criminal activity, (ii) the capital felony was committed while the defendant was under the influence of mental or emotional disturbance, and (iii) the catchall circumstance. The nonstatutory mitigating circumstances which were found related to defendant's (i) mental and emotional disturbance; (ii) inability to resist the influence of others because of alcohol and mental problems; (iii) conviction by the testimony of an accomplice; (iv) honorable service of his country in the Gulf War; and (v) good relationship with his mother, brother, and sister. The jury declined to find the statutory mitigating circumstances (i) that defendant's capacity to appreciate the criminality of his conduct was impaired, N.C.G.S. § 15A-2000(f)(6); (ii) that defendant's capacity to conform his conduct to the requirements of the law was impaired, N.C.G.S. § 15A-2000(f)(6); (iii) the age of defendant at the time of the crime, N.C.G.S. § 15A-2000(f)(7); and (iv) that defendant acted under duress or under the influence of another person, N.C.G.S. § 15A-2000(f)(5).

We begin our analysis by comparing this case to those cases in which this Court has determined the sentence of death to be disproportionate. This Court has determined the death sentence to be disproportionate on seven occasions. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983).

We find no significant similarity between the instant case and any of the seven cases in which we have held the death penalty to be disproportionate. We note that none of the cases in which the death

penalty has been held disproportionate involved the murder of more than one victim. Additionally, none of these cases included a sex offense as part of the course of conduct of the crimes. Finally, multiple aggravating circumstances were found to exist in only one of the disproportionate cases. *State v. Young*, 312 N.C. 669, 325 S.E.2d 181.

In finding the death penalty to be disproportionate in *Young*, this Court focused on the jury's failure to find either the "especially heinous, atrocious, or cruel" aggravating circumstance, N.C.G.S. § 15A-2000(e)(9), or the "course of conduct" aggravating circumstance, N.C.G.S. § 15A-2000(e)(11). *State v. Gibbs*, 335 N.C. at 73, 436 S.E.2d at 363. In this case both the especially heinous, atrocious, or cruel circumstance and the course of conduct circumstance were found to exist by the jury for each murder.

"[I]n our assessment of whether a case is proportionate to other death-affirmed cases, this Court's attention is focused upon an 'independent consideration of the individual defendant and the nature of the crime or crimes which he has committed.'" *State v. Robinson*, 336 N.C. 78, 139, 443 S.E.2d 306, 337 (1994) (quoting *State v. Pinch*, 306 N.C. 1, 36, 292 S.E.2d 203, 229, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982), *reh'g denied*, 459 U.S. 1189, 74 L. Ed. 2d 1031 (1983), *overruled in part on other grounds by State v. Benson*, 323 N.C. 318, 372 S.E.2d 517)), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 650 (1995).

The fact that defendant is a multiple-murderer stands as a "heavy" factor against defendant when determining the proportionality of a death sentence. *State v. McHone*, 334 N.C. 627, 648, 435 S.E.2d 296, 308 (1993), *cert. denied*, —— U.S. ——, 128 L. Ed. 2d 220 (1994); *State v. Robbins*, 319 N.C. 465, 529, 356 S.E.2d 279, 316, *cert. denied*, 484 U.S. 918, 98 L. Ed. 2d 226 (1987). Another factor in our consideration of proportionality in the instant case is this Court's observation that juries consistently return death sentences in cases where the victim has been sexually assaulted. *State v. Holden*, 321 N.C. at 165, 362 S.E.2d at 538; *see State v. Vereen*, 312 N.C. 499, 324 S.E.2d 250, *cert. denied*, 471 U.S. 1094, 85 L. Ed. 2d 526 (1985); *State v. Smith*, 305 N.C. 691, 292 S.E.2d 264, *cert. denied*, 459 U.S. 1056, 74 L. Ed. 2d 622 (1982); *State v. Rook*, 304 N.C. 201, 283 S.E.2d 732.

In *State v. Lee*, 335 N.C. 244, 439 S.E.2d 547, the defendant kidnapped and raped two women on two different occasions. Defendant murdered one victim by beating and strangling her; the other victim managed to escape. The jury found three aggravating circumstances

when determining defendant's sentence for the murder: (i) that the murder was committed while defendant was engaged in a kidnapping; (ii) that the murder was especially heinous, atrocious, or cruel; and (iii) course of conduct. *Id.* at 293, 439 S.E.2d at 573. The jury found the statutory mitigating circumstances: (i) that defendant had no significant history of criminal activity; (ii) that defendant was mentally and emotionally disturbed; and (iii) that defendant's capacity to appreciate the criminality of his conduct was impaired. In affirming the defendant's death sentence, this Court noted that "[t]he crimes the defendant committed against the victim occurred over a period of several hours. During this time, the victim undoubtedly experienced extreme psychological and physical torture." *Id.* at 297-98, 439 S.E.2d at 575-76.

In the instant case the victims also experienced extreme psychological and physical torture. The victims heard defendant shoot at Wesley Parrish and were forced to ride in the car with defendant and his friends. The victims were then raped repeatedly before being killed. In addition, unlike in *Lee*, where the defendant killed only one of his victims, here both victims were killed.

In *State v. McCollum*, 334 N.C. 208, 433 S.E.2d 144, the nineteen-year-old defendant was convicted of first-degree murder and of first-degree rape. *Id.* at 217, 433 S.E.2d at 148. As in the murder of Bernadine Parrish, the victim in *McCollum* died of asphyxiation. *Id.* at 218, 433 S.E.2d at 149. The jury found the aggravating circumstances that the murder was committed for the purpose of avoiding or preventing lawful arrest and that the murder was especially heinous, atrocious, or cruel. *Id.* at 239-40, 433 S.E.2d at 161. As in the instant case, the jury found the statutory mitigating circumstances that defendant has no significant history of prior criminal activity and that the felony was committed while defendant was under the influence of a mental or emotional disturbance. *Id.* at 240, 433 S.E.2d at 161. Also as in the instant case, the jury rejected the statutory mitigating circumstances that defendant acted under duress or domination of another, that his capacity to appreciate the criminality of his conduct was impaired, and defendant's age at the time of the crime. The Court upheld the death sentence, stating that "[a]fter comparing this case carefully with all others in the pool of 'similar cases' used for proportionality review, we conclude that it falls within the class of first-degree murders for which we have previously upheld the death penalty." *Id.* at 244-45, 433 S.E.2d at 164.

We conclude that as in *McCollum*, the murders in the instant case "fall[] within the class of first-degree murders for which we have previously upheld the death penalty." *Id.* The murders at issue in this case are marked by brutality and callousness. The evidence indicates that defendant, along with two of his friends, forced the victims to endure the trauma of being kidnapped at gunpoint and repeatedly raped before being killed. When defendant decided to kill the victims, he began by attempting to strangle Bernadine Parrish. Parrish at some point became unconscious. However, Parrish later regained consciousness; so defendant strangled her again. The second time he was successful in killing her. Defendant had also attempted to strangle Bobbie Jean Hartwig. However, she also regained consciousness; so defendant told Bradford to "take care of business." Bradford then took a shotgun and shot Bobbie Jean Hartwig in the chest. The victims were killed so that defendant "would never have to go to prison."

In light of the foregoing, we find that the death penalty in this case is not excessive or disproportionate.

We hold that defendant received a fair trial and capital sentencing proceeding free from prejudicial error. Comparing defendant's case to similar cases in which the death penalty was imposed and considering both the crimes and defendant, we cannot hold as a matter of law that the death penalty was disproportionate or excessive.

NO ERROR.